Gustavo **OLMOS**, Plaintiff,

v.

Ronald **GOLDING**, Individually, and **Lind–Waldock & Company**, an Illinois Corporation, Defendants.

No. 88 C 8366.

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1989.

Gustavo Olmos, South Pasadena, Cal., pro se.

Leslie A. Blau and Cacilia R. Masover, Winston & Strawn, Chicago, Ill., for plaintiff.

Frederick I. Bourg & Assoc., Frederick I. Bourg and David G. Duggan, Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

Before the court is the motion of defendants, Ronald Golding and Lind–Waldock & Company, brought pursuant to Fed.R. Civ.P. 56(b), for summary judgment on the Second Amended Complaint of plaintiff, Gustavo Olmos. Briefing on this summary judgment motion has spawned two motions by defendants to strike affidavits submitted by Olmos and his attorney, Leslie A. Blau, in support of Plaintiff's Brief in Opposition to Defendants' Summary Judgment Motion. The motions to strike are denied and, for the reasons set forth below, summary judgment is entered in favor of defendants.

## FACTS

The parties have complied with Local Rule 12. Plaintiff has raised objections to the defendants' statement of undisputed facts. A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Plaintiff has raised genuine disputes. However, after close examination, the court concludes that the plaintiff has not raised an issue of *material* fact and finds the following facts undisputed.

Olmos is a United States citizen residing in California. Lind–Waldock is an Illinois corporation engaging in the discount commodity brokerage business and is registered with the Commodity Futures Trading Commission under the Commodity Exchange Act as a futures commission merchant. *See* 7 U.S.C. § 2. Golding, an Illinois resident, has been employed by Lind–Waldock since 1981 and is currently a vice-president and branch office manager.

On May 28, 2985, Olmos opened a commodity trading account with Lind–Waldock by executing a written account application (the "Agreement") which set forth the terms and conditions of the relationship between himself and Lind–Waldock.

The following paragraphs of the Agreement are pertinent to the issues at hand:

1. All transactions by Broker on Customer's behalf shall be subject to the applicable constitution, rules, regulations, customs, usages, ruling and interpretations of the exchange or market (such as the Chicago Board of Trade and the Chicago Mercantile Exchange) and its clearing houses, if any, on which such transactions are executed by Broker or its agents for Customer's account, and to all applicable governmental acts and statutes (such as the Commodity Exchange Act) and to rules and regulations made thereunder; Broker shall not be liable to Customer as a result of any action taken by Broker or its agents to comply with any such constitution, rule, regulations,

usage, ruling, interpretation, act or stat-
ute....

.    .    .    .    .

2. THIS IS THE ENTIRE AGREE-
MENT BETWEEN THE BROKER AND
CUSTOMER AND NO PROVISIONS
HEREOF SHALL IN ANY RESPECT
BE WAIVED OR MODIFIED UNLESS
IN WRITING AND SIGNED BY A
PRINCIPAL OF BROKER. CUSTOM-
ER ACKNOWLEDGES THAT NO PER-
SON OTHER THAN A PRINCIPAL
HAS AUTHORITY TO MODIFY OR
WAIVE THE PROVISIONS OF THE
AGREEMENT OR TO ESTABLISH
CUSTOMS AND PRACTICES OF
TRADING CONTRARY TO THE
TERMS OF THIS AGREEMENT. (em-
phasis in original)

.    .    .    .    .

6. Customer agrees at all times to main-
tain such margins in this account as Bro-
ker may from time to time require, in its
sole discretion, and will promptly meet
all margin calls. Margin requirements
may be increased at Broker's discretion
and may be retroactive. Customer
agrees when requested, whether through
telephone order or other communication,
to wire transfer margins or any funds
required by Broker, and to furnish bro-
ker with the names of Bank officers and
information necessary for immediate ver-
ifications. If at any time Customer's
account does not contain the amount of
margin required, Broker may, but is not
obligated to at any time without notice,
close out Customer's positions in whole
or in part and take any actions as noted
in Paragraph 8.

.    .    .    .    .

9. Whenever Broker deems it necessary
or advisable for Broker's protection, Bro-
ker is authorized, at its sole discretion
and for Customer's account, to cover any
position Customer may have with Broker
through purchase or sale on any Ex-
change, and to sell as Broker deems ap-
propriate any collateral deposited with
broker, whether or not customer has ac-
tually received notice of Broker's inten-
tion to effect the foregoing, it being un-
derstood that a prior tender, demand or
call of any kind from Broker, or prior
notice from broker, of the time and place
of such sale or purchase shall not be
considered a waiver of Broker's right to
sell or buy any positions or collateral at
any time as hereinafter provided period.
After deducting costs and expenses in
connection with any such transactions,
Broker may apply any remaining pro-
ceeds to the payment of any liabilities
Customer may have to Broker, and in the
event such proceeds are insufficient for
the payment of all liabilities, Customer
shall promptly upon demand, pay to Bro-
ker the deficit, together with interest
thereon and all costs of collection, includ-
ing "... reasonable attorneys' fees."

The Rules of The Commodity Exchange,
Inc., which were incorporated into the
Agreement, provide in pertinent part:

Rule 6.01(a):

... no member or member firm shall
carry an outright or spread position in
a futures or option contact for a cus-
tomer unless the member or member
firm ...

(2) has received or expects to receive
*on a timely basis* the additional origi-
nal margin, maintenance margin, or
premium required for each futures
contract or option position which the
member or member firm carries for
such customer. (emphasis supplied)

Rule 6.07(a):

... if a customer fails to remit any
payment demanded pursuant to this
Chapter 6 ("Margin Rules") on a time-
ly basis, the carrying member or mem-
ber firm shall exercise reasonable care
to close out such portion of the custom-
er's positions as will leave the remain-
ing unliquidated positions (if any) fully
margined....

Rule 6.07(b) provides:

... A member or member firm shall
not be required to close out a custom-
er's account ... if

(2) market movements favorable to
the customer which equal or exceed
the amount of payment demanded oc-

cur within a reasonable time after demand for payment is made.

A written "Notice to Customers", which accompanied the Agreement, clearly informed Olmos that Lind–Waldock required that all customers meet demands for margin by bank wire the same day that the demand was made. Second Amended Complaint Exhibit B; Defendants' Statement Of Material Facts In Support Of Their Motion For Summary Judgment Exhibit XVI. Olmos had previously met all margin demands the same day by bank wire. Olmos Deposition p. 47–49; Letter of April 2, 1988 from Olmos to Golding.

On February 4, 1986, Olmos purchased for his account ten futures contracts of July Silver at the price of $5.98 per oz. On March 25, 1986, Olmos purchased for his account ten futures contracts of September Silver at the price of $5.770 per oz. These contracts were contracts as defined in the Rules of Commodity Exchange, Inc. ("COMEX"), and each comprised 5000 ounces. Thus, Olmos owned and controlled 50,000 ounces of July COMEX Silver and 50,000 ounces of September COMEX Silver.

On March 31, 1986, Lind–Waldock's margin requirements for COMEX silver were as follows:

| | |
|---|---|
| Initial margin requirement to purchase contact: | $2,500.00 per contract |
| Maintenance margin to hold contract: | $2,000.00 per contract |

As of the close of the Silver Market (11:20 P.M. PST) on March 31, 1986, the respective prices of July COMEX Silver and September COMEX Silver were $5.231 and $5.298 per ounce. The total value of Olmos' account at the close of the COMEX Silver Market on March 31, 1986, was $6,058.86. At that time, based upon the above prices, Olmos' account was on margin call to the extent of $43,941.14.

At or about 11:15 a.m., PST, March 31, 1986, Olmos was advised by defendant Golding that his account was undermargined and that, unless Olmos wire transferred sufficient funds to meet the margin call that day, in time to be confirmed before the open of the Silver Market the next day, stop loss orders would be placed to protect the account from becoming a deficit. Second Amended Complaint ¶ 2; Olmos Deposition p. 46; Golding Affidavit p. 1–2. Olmos never contacted his bank after 11:15 a.m., PST, March 31, 1986 for the purpose of ordering a wire transfer of funds to his trading account with Lind–Waldock, and, further, never thereafter deposited any funds by any means into his trading account.

At or about 8:00 a.m., CST on April 1, 1986, Lind–Waldock caused to be placed stop loss orders for the account of Olmos. The stop prices were established at or near the price that Olmos' account would sustain a deficit,[1] and were placed to sell all twenty contracts held by Olmos. Olmos was advised of the fill prices on the stop loss orders at or about 8:30 a.m., PST on April 1, 1986. The stop loss orders were filled prior to 10 a.m., CST, and Olmos account value was, based upon his said fill prices, $1,523.26. On April 1, 1986, the COMEX Silver Market further moved against Olmos' positions closing for July and September contracts, respectively, at $5.19 and $5.25 per ounce.

## DISCUSSION

Olmos' Second Amended Complaint pleads five counts, breach of contract, common law fraud, unauthorized trading under 7 U.S.C. § 6b, breach of fiduciary duty and violation of the Illinois Consumer Fraud and Deceptive Business Practice Act, Ill. Rev.Stat. ch. 121½, ¶ 262, and seeks both compensatory and punitive damages. Defendants have denied all liability and asserted various defenses, among which is that defendants' actions in the transaction out of which plaintiff's claims arose were consistent both with defendants' rights and plaintiff's obligations under both the Agreement and applicable rules and regulations governing the trading of commodities.

---

1. The value of Olmos account just prior to the opening of the silver market on April 1, 1986, was $6,058.86. If the price of silver dropped $.0605886 per ounce, Olmos; account value would have been zero ($6,058.86 ÷ 100,000 ounces).

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which support his complaint. *Id.; see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.*

The undisputed material facts require judgment as a matter of law be granted in favor of defendants. The Agreement explicitly gives Lind–Waldock the authority, "in its sole discretion," to set and increase margin requirements for Olmos' account. Margin requirements could even be retroactive. Olmos undertook a corresponding obligation, at all times, to maintain such margins in his account as Lind–Waldock would from time to time require. Specifically, Olmos agreed, among other things, to wire transfer margins or any funds required by Lind–Waldock. In the event Olmos' account was to become underfunded for any reason, such as failure to meet a margin call, Lind–Waldock had the authority under the Agreement, in its sole discretion, for its own protection and without notice to Olmos, to close out Olmos' position by placing stop loss orders.

■ It is undisputed that on March 31, 1986 Olmos' account was on margin call to the extent of $43,931.14. It is similarly undisputed that Golding telephoned Olmos on March 31, 1986 at 11:30 a.m., PST, and, entirely consistent with Lind–Waldock's express rights under the Agreement, advised Olmos both that his account was undermargined and that, unless he wire transferred funds that day in time for confirmation prior to the opening of the silver market on April 1, 1986, stop loss orders would be placed on his account. Olmos Deposition, p. 46; Golding Affidavit p. 1–2. Olmos never wire transferred the funds. Stop loss orders were placed on his account the next day and his contracts ultimately sold, again, all within Lind–Waldock's authority under the Agreement.

In *Stotler and Company v. Khabushani*, 703 F.Supp. 738 (N.D.Ill.1989), the similar actions of a commodities broker in closing out an undermargined account were found not to constitute a breach of an account agreement virtually identical to the one in the instant case. *Id.* at 740. That the customer's account in *Stotler* was underfunded from the outset does not serve to distinguish it from this case. There is no indication that the *Stotler* court considered the fact that the customer initiated the account with a check drawn on insufficient funds. Rather, the result therein was mandated by the existence of a valid and enforceable contractual term authorizing the broker to close out an undermargined account with or without notice to the customer. The same result is required here.

Furthermore, Lind–Waldock's actions were consistent with the Commodity Exchange rules which prohibit a broker from carrying a customer's undermargined position unless the broker expects to receive the margin funds on a timely basis and, where a margin call is not met, specifically authorize the broker to close out the customer's position[2].

---

**2.** While there is an exception to this rule which applies where the market moves favorably to

the customer's position, it is undisputed that the

Whether or not an investor was given a reasonable amount of time in which to comply with a margin call before liquidating an account, under certain circumstances, has been held to be a question of material fact precluding summary judgment. *See Navlawala v. Jack Carl Associates, Inc.*, 669 F.Supp. 204, 207 (N.D.Ill.1987). Yet, in a case where a Chicago Board of Trade Rule provided that one hour was a reasonable time in which to require an investor to meet a margin call, the Eighth Circuit upheld the provision against a challenge of unconscionability. *See Geldermann and Company, Inc. v. Lane Processing, Inc.*, 527 F.2d 571 (8th Cir.1975).

■ The defendants, though citing *Geldermann*, have not specifically invoked any regulatory definition of the "timely basis" or reasonable time in which a margin call must be met. Yet, here Olmos was given an entire day in which to meet the margin call. Olmos' letter of April 2, 1986, which in part confirms certain portions of Olmos' conversations of March 31, 1986 with Lind–Waldock representatives, renders it an undisputed fact that Olmos informed Lind–Waldock that he was not going to meet the margin call that day in time for confirmation prior to the opening of the silver market on April 1, 1986.[3] Therefore, in the alternative, the court holds, as a matter of law, that, in light of the speed in which extreme price fluctuations can occur in the commodities market and the need for brokers to minimize their risk as guarantors of the investor's trades (Agreement ¶ 16), Lind–Waldock acted pursuant to applicable regulations as it gave Olmos a reasonable time in which to meet the margin call by requiring him to do so by the end of the day and it placed stop loss orders on Olmos' account only once it could not reasonably expect Olmos to meet the margin call on a "timely basis."

Olmos places great reliance on his prior discussions on March 31, 1986, with a Lind–Waldock representative (Olmos claims he spoke to Golding), in which Olmos alleges that he was instructed that he was not required to meet the margin call that day, but rather had until the next day to wire the funds. Second Amended Complaint ¶ 8. Defendants deny making such a statement. However, even assuming that Olmos' allegation is true and contained in a taped conversation, Olmos cannot prevail, as any previous instructions that Olmos was given were properly countermanded by Golding in his subsequent conversation with Olmos at 11:30 a.m., PST, the same day. Pursuant to the Agreement, Lind–Waldock could, in its sole discretion, set margin requirements, even making them retroactive. The Notice to Customers required that margin calls be met the same day they were made. Therefore, Golding was acting within the terms of the Agreement and consistent with the Notice to Customers when he, on behalf of Lind–Waldock, informed Olmos that he was required to meet the margin call by wire transferring funds that day.

As a further attempt to avoid Lind–Waldock's defense, Olmos effectively contends that the contract was modified. He relies upon a state court decision, *Dean Witter and Co. v. Tiger Tail Farms* 674 S.W.2d 699, 703 (Tenn.1984), for the proposition that where there is a course of dealing allowing a customer a certain period in which to met margin calls, it may be unreasonable to impose a shorter period. Olmos then argues that because an outright misrepresentation as to when a margin is due is more serious than a course of dealing,

---

silver market continued to decline on April 1, 1986.

**3.** The Olmos letter was an exhibit to Olmos' Affidavit, but was originally omitted. A copy of this letter was supplied to the court at a later date by counsel for plaintiff. Accompanying it was a copy of a letter from counsel for plaintiff to counsel for defendants' dated September 25, 1989, in which counsel for plaintiffs expressed his displeasure at counsel for defendant's initial reaction to the omission of the Olmos letter.

(Defendants moved to strike Olmos' affidavit). There is no indication that counsel for plaintiff informed counsel for defendant that he was providing the court with a copy of the September 25, 1989 letter. Certainly, when it is necessary for counsel to correspond with the court, all counsel of record must be copied in order to avoid *ex parte* contact. However, it is inappropriate for counsel to provide the court with copies of correspondence between themselves.

the court should find Lind–Waldock to have acted unreasonably in requiring Olmos to meet a same day margin call.[4]

Deviation from the express terms and conditions of a contract may be justified where a party asserts de facto or implied modification based upon a course of dealing. This is because the other parties conduct in the course of dealing, where consistent with the alleged modification, is tangible evidence of the modification asserted. Here there was no course of dealing between Olmos and Lind–Waldock which could support the conclusion that based upon prior transactions Olmos was not required to immediately meet margin calls. Olmos himself acknowledges that he had wire transferred funds the same day in response to previous margin calls. Olmos Deposition pp. 48–49; Letter of April 2, 1986 from Olmos to Golding.

Furthermore, the court is not persuaded that an alleged misrepresentation is a stronger reason than is a course of dealing for the effective modification of contractual obligations. Unlike a course of dealing, where the other parties prior established conduct stands as strong evidence (presuming the absence of a no waiver clause) of the claimed deviation from contractual terms, there is no evidence, except for Olmos' disputed allegation, that Lind–Waldock intended to abandon rights expressly reserved to it in the Agreement. Certainly, plaintiff's misrepresentation claims might have had some merit if the sequence of events were transposed and Olmos had been instructed by a Lind–Waldock representative that he had an additional day to wire the funds after Golding instructed him to meet the margin call the same day. But, this was not the case.

What Olmos is really arguing is that Lind–Waldock is bound by the earlier alleged representation because it constituted an oral modification of the Agreement, whereby Lind–Waldock gave up the right in its sole discretion to set margins, demand funds by immediate wire transfer and close out undermargined accounts. Yet, the Agreement expressly precludes oral modification. Agreement ¶ 2. The certainty of contracting parties' rights and obligations, both in predictability of future conduct and in ease of measuring performance, which is promoted by reducing the parties' agreement to writing is greatly reduced where one party is allowed to prevail upon a claim that contractual terms had been orally modified. This is why parties include no oral modification clauses and courts enforce them. This court rejects Olmos' claim of oral modification. *See Stotler*, 703 F.Supp. at 740.

The court need not spend much time grappling with the final factual excuse proffered by Olmos. He alleges that he would have been able to immediately wire transfer the margin funds earlier in the day when he was allegedly told that he did not have to do so until the next day, but by the time Golding informed him that he must meet the margin call that day, in time for confirmation prior to the opening of the silver market on April 1, 1986, it was no longer possible for him to go to his bank to order a wire transfer. Plaintiff's Rule 12(m) Statement of Contested Material Facts p. 2. This is because Olmos alleges that he had to attend a class from which he would be dropped if he went to the bank to order the wire transfer rather than attend. Additional Facts Submitted by Plaintiff # 32, Olmos Affidavit. Olmos, therefore, also implicitly relies upon the time difference resulting from his west coast residence, defendants' Chicago location, and the Silver Market in New York. That it would have been inconvenient for Olmos to comply with his contractual obligations or that compliance would have carried with it an opportunity cost neither excuses his compliance nor transforms actions by Lind–Waldock, which were entirely consistent with its rights under the Agreement, into actionable conduct. *See Stotler*, 703 F.Supp. at 740–41. Any inconvenience suf-

---

**4.** Olmos appears to be on the verge of turning his contract claim into one based on tort—a tactic which, under the circumstances of this case, would not have found favor with the court.

fered by Olmos does not justify imposing additional risk upon Lind–Waldock.[5]

Concluding that the undisputed facts require a judgment as a matter of law that Lind–Waldock did not breach the Agreement, but rather acted consistent with its express terms and applicable Exchange rules, necessarily requires judgment as a matter of law in Lind–Waldock's favor on the remainder of Olmos' claims.

■ Count II, Olmos' fraud claim, must fail. In light of Lind–Waldock's rights under the Agreement, any reliance on Olmos' part on an alleged earlier instruction giving him an additional day in which to meet the margin call was not justified after Golding informed him that the margin call must be met that day. *See Stotler,* 703 F.Supp. at 741. Neither can defendants' actions, consistent with the Agreement and applicable regulations, be the basis for Commodity Exchange Act Fraud as pled in Count III. Count IV, which pleads a breach of fiduciary duty must also fail for the same reasons discussed above with respect to Count I and because of the absence of any allegations to support a finding of a fiduciary relationship. Moreover, to find a fiduciary relationship of the nature necessary to support Olmos' claim would be directly contrary to the terms of the Agreement.

■ Count V in which Olmos seeks reformation of the Agreement to provide for attorney's fees for Olmos in the event he prevails, is mooted by the above decisions adverse to him. However, the court must note that it considers this claim to border on frivolousness. The Agreement required disputes to be adjudicated in Illinois and only allowed Lind–Waldock to recover attorneys fees in the event it prevailed. Lind–Waldock bargained for these terms. Olmos was not fraudulently induced nor forced to enter into the Agreement. Choice of law provisions and agreements with respect to attorneys' fees, of this sort, are valid and enforceable and not a decep-

tive business practice. To reform the Agreement under California law because this action was originally wrongfully brought there by Olmos would be to reward Olmos for disregarding an express forum selection provision, thereby setting a dangerous precedent.

Summary judgment is entered in favor of Lind–Waldock and Golding and against Olmos on all claims.

IS SO ORDERED.

---

5. Olmos' reliance upon the implied covenant of good faith and fair dealing is also misplaced. Certainly this implied covenant may be utilized to fill in contractual gaps, such as governing the manner in which a party may exercise its con-

tractual rights. However, this court will not employ it to alter an express contractual provision. Here Lind–Waldock was specifically entitled, under the Agreement, to take the actions it did in the manner that it did.