

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-9-1998

# In Re: Kaplan

Precedential or Non-Precedential:

Docket 97-1394

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: Kaplan" (1998). *1998 Decisions.* Paper 139.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/139

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1394

IN RE: MANUEL KAPLAN,

Debtor

MANUEL KAPLAN; ARTHUR LIEBERSOHN, Trustee

v.

FIRST OPTIONS OF CHICAGO, INC.

Manuel Kaplan,

    Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Civil Action No. 95-cv-06040)

Argued December 12, 1997

Before: NYGAARD and ALITO, Circuit Judges,  and
DEBEVOISE, District Judge*

(Opinion filed: June 9, 1998)

_____

*The Honorable Dickinson R. Debevoise, Senior United States District
Judge for the District of New Jersey, sitting by designation.

Gary A. Rosen (Argued)
Connolly, Epstein, Chicco, Foxman,
Engelmyer & Ewing
1515 Market Street
9th Floor
Philadelphia, PA 19102

Attorney for Appellant
Manuel Kaplan

Stephen P. Bedell
Timothy G. McDermott (Argued)
Gardner, Carton & Douglas
321 North Clark Street, Suite 3000
Chicago, Illinois 60610

William A. Slaughter
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103
 Attorneys for Appellee
First Options of Chicago, Inc.

OPINION OF THE COURT

ALITO, Circuit Judge:

In this bankruptcy appeal, Debtor-Appellant Manuel
Kaplan contests an order allowing First Options of
Chicago's proof of claim. Kaplan argues that we should
reverse the order allowing the claim because First Options
materially breached the contracts under which the claim
arose. Concluding that First Options did not breach the
parties' contracts, the bankruptcy and district courts
allowed the claim. For the reasons stated below, we reverse
and remand.

I.

From 1981 to 1989, Manuel Kaplan was a professional
options trader on the Philadelphia Stock Exchange. In

1984, Kaplan began trading through MK Investments, Inc. ("MKI"), which was a market maker on the exchange.[1] Kaplan became MKI's sole shareholder in 1986.

To facilitate its trading business, MKI entered into various contracts with First Options. Under these contracts, First Options agreed to act as MKI's clearing firm, providing a variety of support functions, such as generating account statements, keeping records, investing short-term funds, providing office space and margin,[2] and guaranteeing MKI's obligations to the exchange. Since First Options assumed the role of MKI's guarantor, the parties' contracts granted First Options certain powers over MKI's trading account.

While the business relationship between MKI and First Options was initially profitable, MKI's account with First Options suffered approximately $12 million in losses during the stock market crash of 1987. These losses left MKI's account with a deficit of approximately $2 million. As MKI's guarantor, First Options was liable for this deficit. First Options therefore attempted to minimize its exposure by liquidating the remaining positions in MKI's trading account. This liquidation created a dispute between the parties as Kaplan asserted that First Options' actions in liquidating the account needlessly compounded MKI's losses, rather than alleviating its deficit.

After the 1987 market crash, MKI and First Options negotiated a Workout Agreement under which the parties settled their dispute and arranged for MKI to resume its trading activities. This Workout Agreement consisted of four documents: (1) a Letter Agreement executed by Kaplan, his

_____

1. A market maker is "a dealer who holds himself out . . . as being willing to buy or sell securities for his own account on a continuous basis." Philadelphia Stock Exch. By-Laws S 23-2. See also Philadelphia Stock Exch. Guide (CCH) P 1552.

2. Under this margin arrangement, First Options extended credit to MKI for trading purposes. By virtue of this leverage, MKI was able to carry significantly larger positions than would have been available if it had been limited to its own capital. As a result of this lender-borrower relationship, a clearing firm ordinarily has a security interest in the positions in its customers' trading accounts.

wife (Carol Kaplan), First Options, and MKI; (2) a Guaranty executed only by MKI; (3) a Subordinated Loan Agreement executed by First Options and MKI; and (4) a Subordinated Promissory Note executed by MKI.[3] Under the terms of these documents, MKI agreed to repay more than $5 million to cover its trading deficits and various other amounts that First Options had advanced. MKI also agreed to deposit $900,000 in new capital into its trading account, to turn over various other assets to First Options, and to clear its future trading activity exclusively through First Options. The Letter Agreement also provided that the Kaplans would file income tax returns to obtain any individual tax refunds due from 1987 and remit those refunds to First Options.[4] In turn, First Options allowed MKI to roll over its debt and agreed once again to provide the clearing services and leverage necessary for MKI's trading business.

In April 1988, MKI resumed trading pursuant to the terms of the Workout Agreement. Through successful trading, MKI increased the value of its account to approximately $2 million. However, before the market opened on January 16, 1989, Coastal Corporation unexpectedly announced a takeover bid for Texas Eastern Corporation ("TET"), a stock in which MKI had a significant short position.[5] This position exposed MKI to potential losses if the price of TET stock increased.[6] Unfortunately for MKI, this potential was realized as Coastal's bid caused

_____

3. Several of these documents involved other parties not relevant to this appeal.

4. As this court has previously determined in a related appeal, Mr. and Mrs. Kaplan executed this Letter Agreement in their individual capacities, but executed the remaining documents only on behalf of MKI. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1513–14 (3d Cir. 1994).

5. A trader assumes a short position when he agrees to sell at a future date assets that he does not yet own. See Richard W. Jennings, et al., Securities Regulation 8 (7th ed. 1992); Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance 636 (4th ed. 1991).

6. The parties agree that MKI's position was short approximately 150,000 to 170,000 shares of TET stock. Consequently, each dollar increase in the price of TET stock would have increased MKI's loss by $150,000 to $170,000.

4

TET's price to jump from $30 to $45 before the opening of trading on January 16. At the $45 price, MKI would have lost more than $1.5 million if it had purchased enough TET shares to cover its short position. However, because MKI was not required to cover its short position immediately, it had an opportunity to evaluate the risk of further market fluctuations. Any reduction in the price of TET in the days following Coastal's bid would have allowed MKI to regain its lost value, while any further increase would have inflicted additional losses.

The parties disagree over whether Kaplan took appropriate steps to analyze and alleviate the risk that the TET position posed to MKI's account. However, the parties agree that MKI was unable to reduce its short position significantly on January 16 despite actively trading in TET options and stock. First Options contends that the parties agreed to meet on the morning of January 17 to reassess MKI's position. Kaplan does not recall such an agreement and did not attend the meeting. When Kaplan failed to arrive at the meeting, First Options instructed one of MKI's traders to purchase the 150-170,000 shares of TET stock or stock options necessary to cover MKI's short position. While this action eliminated any further risk from the TET position, it also locked in MKI's existing losses and deprived MKI of the benefit of any future decline in TET's price.

First Options personnel confronted Kaplan when he arrived at the exchange later on the morning of January 17. The bankruptcy court noted that this exchange "went badly." Following this conversation, First Options ordered Kaplan to leave the premises and took control of MKI's trading account. First Options disconnected MKI's phone lines, removed MKI's traders from the floor of the exchange, canceled MKI's outstanding orders and instructed brokers not to take orders placed by MKI.

MKI's account still had a net value of approximately $500,000 when First Options assumed control on January 17. However, the account's value declined as First Options liquidated the remaining assets over the following months. By the time First Options finished liquidating the account, it had a final deficit of approximately $65,000.

5

Kaplan filed a bankruptcy petition under Chapter 11 in February 1993. He subsequently converted his petition to Chapter 7. First Options asserted a proof of claim to obtain the income tax refunds mentioned in the parties' Letter Agreement. In response, Kaplan asserted several counterclaims and defenses against First Options. Kaplan argued that First Options' actions in seizing and liquidating MKI's accounts breached the Workout Agreement and the implied obligations of good faith and fair dealing. To remedy these breaches, Kaplan sought damages and a ruling excusing his obligation to surrender his tax refund to First Options. The bankruptcy court rejected Kaplan's claims and defenses, holding that the parties' agreements explicitly authorized First Options' actions in seizing and liquidating MKI's account. The district court affirmed.

II.

As an initial matter, First Options asserts that we must consider whether Kaplan has standing to assert his counterclaims. First Options argues that Kaplan's counterclaims are improper because he seeks to recover personally for damages suffered by MKI. Kaplan responds that First Options owed direct contractual duties to him individually and that his claims are thus for personal rather than derivative injuries. The bankruptcy court did not address the standing issue, and the district court declined to address it because the court concluded that Kaplan's counterclaims failed on the merits. See In re Kaplan, Civ. Action No. 95-95-6040 at 9 (E.D. Pa. Apr. 21, 1997).

The derivative injury rule holds that a shareholder (even a shareholder in a closely-held corporation) may not sue for personal injuries that result directly from injuries to the corporation. See Singletary v. Continental Ill. Nat'l Bank & Trust Co., 9 F.3d 1236, 1240 (7th Cir. 1993); 7 Mid-State

_____

7. Since the contract between Kaplan and First Options contains an Illinois choice-of-law provision, the district and bankruptcy courts correctly applied Illinois law to the contract claims at issue. See Admiral Corp v. Cerullo Elec. Supply Co., 32 F.R.D. 379, 381 (M.D. Pa. 1961) (stating that when a contract directs the usage of Illinois law, "the conflict of laws rules of Pennsylvania . . . [require a court] to look to the law of Illinois to determine the rights and obligations of the parties in interpreting the contract.").

Fertilizer v. Exchange Nat'l Bank, 877 F.2d 1333, 1335 (7th Cir. 1989); Pitchford v. Pepi, Inc., 531 F.2d 92, 97 (3d Cir. 1975). In holding that Kaplan is not personally liable for MKI's obligations to First Options, this court has previously recognized the separate corporate existence of MKI. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1513-14 (3d Cir. 1994). Accordingly, since Kaplan chose to structure his business in the corporate form and received the benefits of that form by avoiding liability for MKI's debts, the derivative injury rule prevents him from piercing the corporate veil in reverse in order to recover individually for MKI's losses. See Kagan v. Edison Bros. Stores, Inc., 907 F.2d 690 (7th Cir. 1990) (holding that plaintiffs could not obtain both "limited liability for debts incurred in the corporate name, and direct compensation for its losses.").

The derivative injury rule, however, will not bar Kaplan's claims if he seeks to recover for injuries that were inflicted on him individually rather than on the corporation. See Kroblin Refrigerated XPress, Inc. v. Pitterich, 805 F.2d 96, 104 (3d Cir. 1986). Since Kaplan signed the Workout Agreement in his individual capacity and thereby promised to give First Options his income tax refund, the central question with respect to the standing issue concerns the nature of the consideration, if any, that Kaplan himself received in exchange for this personal commitment. If he received promises in his individual capacity, he may sue for the breach of those promises. Id. Likewise, if First Options materially breached its promises to Kaplan, he may assert that breach as a defense to First Options' proof of claim. See generally Regan v. Garfield Ridge Trust & Savings Bank, 581 N.E.2d 759, 765 (Ill. App. Ct. 1991); Restatement (Second) of Contracts SS 237, 241 (1979).

A review of the parties' contracts and their positions in this litigation makes it clear that First Options gave Kaplan some commitment as consideration for his promise to remit his tax refund.8 But, while it is clear that Kaplan received

_____

8. If Kaplan had not received some consideration, his promise to pay would be an unenforceable gratuitous gift. See Serpe v. Williams, 776 F. Supp. 1285, 1288 (N.D. Ill. 1991) ("Mutuality of obligation means either both parties are bound to the agreement or neither party is bound. . . .

7

some consideration for his promise to give up his tax refund, the parties disagree about exactly what commitment Kaplan received. An argument could be made that Kaplan received only a release from personal liability for MKI's pre-workout debts. Two provisions of the Workout Agreement specifically mention Kaplan in his individual capacity. In one of these provisions, Kaplan promises to give First Options his tax refund. In the other, First Options releases Kaplan from any personal liability for MKI's pre-workout deficits.9 Since these are the only provisions in the agreements that mention Kaplan in his individual capacity, First Options apparently concludes that Kaplan received only the release as consideration for his commitment to surrender his tax refund. If we were to accept this argument, we would hold that Kaplan has standing to enforce the release, but does not have standing to assert claims for a breach of First Options' promise to provide services to MKI or to assert the breach of those promises as a defense to First Options' proof of claim.10

_____

Both parties must be liable to the other for failure to perform his or her obligation."); Restatement (Second) of Contracts S 71 ("To constitute consideration, a performance or a return promise must be bargained for."). However, neither party asserts that Kaplan's promise is anything but an enforceable commitment.

9. Kaplan has consistently asserted that he is not personally liable for MKI's debts, but this provision released him from any challenge to that position.

10. Kaplan argues that, even if he lacks standing to seek recovery from First Options in his personal capacity, he has standing to assert the material breach of the parties' agreements as a defense to First Options' proof of claim. However, we believe that the considerations that govern Kaplan's standing to bring his counterclaims also determine his standing to assert the defense of a material breach of the parties' contract. If a release from liability was the only consideration that Kaplan received for his tax refund and if First Options honored that release, Kaplan cannot assert the breach of other promises to other entities as a defense to his obligation to surrender his refund. However, if the parties intended for Kaplan to give up his refund to benefit MKI, Kaplan is a direct party to the contract and may assert a material breach of the promise to benefit MKI as a defense to First Options' efforts to enforce the contract. See generally Restatement (Second) of Contracts S 305(1) (noting that a promisor in a third-party contract has a duty to the promisee to perform, even though he also has a similar duty to the intended beneficiary).

8

We conclude, however, that the plain text of the parties' agreements refutes this interpretation. The parties concur that they executed the Workout Agreement for two purposes: to resolve their dispute over MKI's pre-workout debts and to enable MKI to get back into business. The bankruptcy court noted that the parties intended for the Workout Agreement to enable MKI to resume trading, see In re Kaplan, Bankr. No. 93-10625DAS at 4 (Bankr. E.D. Pa. March 7, 1995), and that interpretation is clearly supported by the text of the Letter Agreement. The Agreement acknowledges MKI's debt to First Options and provides a detailed scheme under which MKI agreed immediately to pay down the debt by surrendering a list of assets to First Options. See Joint App. at 75a-90a. Kaplan's promise to surrender his tax refund is placed in the midst of this list of assets to be surrendered, and Kaplan's refund is also specifically earmarked to pay down MKI's debt. See id. at 77a. MKI further promised to infuse new capital into its trading account and agreed to pay the remainder of its debt from future trading profits. See id. at 76a-83a, 85a. In exchange for these assets and promises, First Options agreed once again to provide the clearing services necessary to enable MKI to resume trading. See id. at 84a-85a. Based on these provisions, it is clear to us that the parties intended for Kaplan to surrender his refund in order to get MKI back on its feet. In other words, the Agreement demonstrates that Kaplan exchanged his refund in part for First Options' promise to provide clearing services and leverage to assist MKI in its effort to resume trading.

Under this interpretation, MKI is an intended third-party beneficiary to Kaplan's commitment, and First Options' corresponding promises to provide services to MKIflow both to MKI and to Kaplan individually. See generally Olson v. Etheridge, 686 N.E.2d 563, 566 (Ill. 1997) (noting that a contract entered into for the direct benefit of a third person is enforceable in Illinois); Restatement (Second) of Contracts S 302(1)(b); 17A Am. Jur. 2d ContractsS 440 (1991). Accordingly, since Kaplan is a direct party to the Agreement, he has standing to sue for the breach of First Options' commitment to provide services to MKI. See Olson, 686 N.E.2d at 566 (recognizing that both a promisee and an intended third party beneficiary may sue to enforce a

9

contract); Buschmann v. Professional Men's Ass'n, 405 F.2d 659, 662 (7th Cir. 1969) ("It is well settled that an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation."); Restatement (Second) of Contracts S 305 comment a (noting that a promisee may recover damages that flow from a promisor's failure to perform to the intended beneficiary); 17A Am. Jur. 2d Contracts S 436 (recognizing that a promisor owes overlapping duties to a promisee and a third party beneficiary).11

III.

First Options raises another bar to our consideration of the merits of Kaplan's claims. First Options asserts that Kaplan's claims are barred by res judicata and collateral estoppel because he controlled MKI when First Options and MKI arbitrated similar claims before the Philadelphia Exchange. First Options raised this argument before the bankruptcy court in a motion to dismiss. The bankruptcy court12 noted that under Pennsylvania's control-of-litigation rule, a party may be bound by the results of litigation even if that party, although not a litigant or in privity with a litigant, was "virtually substituted for the actual party in the management and control of the litigation." In re Kaplan, Bankr. No. 93-10625DAS at 18-20 (Bankr. E.D. Pa. Mar. 7, 1995) (quoting Williams v. Lumberman's Ins. Co. of Philadelphia, 1 A.2d 658, 660-61 (Pa. 1938)). However, the bankruptcy court denied First Options' motion to dismiss because it concluded that applying the control-of-litigation rule to this case would eviscerate the rule that a

_____

11. Our conclusion that MKI is an intended third-party beneficiary to Kaplan's promise is sufficient to resolve First Options' assertion that Kaplan lacks standing. Accordingly, we need not determine what damages Kaplan may recover if it proves that First Options breached its promises. See generally Banker's Trust Co. v. Steenburn, 409 N.Y.S.2d 51, 65-69 (N.Y. Sup. Ct. 1978) (discussing one of several measures of a third party promisee's damages); Restatement (Second) of Contracts SS 305, 307, 310 (same).

12. Because the district court concluded that Kaplan's counterclaims lacked substantive merit, it did not address this issue. See Kaplan, Civ. Action No. 95-6040 at 9.

10

shareholder is generally not precluded by a corporation's prior litigation.13 See id.

We need not decide whether the bankruptcy court correctly interpreted Pennsylvania law14  because we hold that the preclusive effect of MKI's prior litigation is governed by federal, not Pennsylvania, law.

To understand the choice-of-law issue that this case presents, we must examine how the parties came to this stage of their litigation. In their previous appeal, the parties petitioned the federal district court to confirm or vacate the Philadelphia Exchange's arbitration award. Since the Federal Arbitration Act does not independently confer subject matter jurisdiction on the federal courts, see, e.g., General Atomic Co. v. United Nuclear Corp., 655 F.2d 968, 970-71 (9th Cir. 1981) (citing cases that stand for this proposition); TM Marketing, Inc. v. Art & Antiques Assocs., L.P., 803 F. Supp. 994, 997-98 (D. N.J. 1992) (same), the parties invoked the district court's diversity jurisdiction. See Kaplan, 19 F.3d at 1509. The district court confirmed the arbitration award against MKI, and it is that judgment

_____

13. The bankruptcy court also concluded that, for purposes of the motion to dismiss, First Options failed to show that Kaplan controlled MKI's prior arbitration.

14. Pennsylvania's appellate courts have repeatedly held that a judgment against a corporation is not binding on a shareholder or officer of the corporation in subsequent litigation. See, e.g., Hornstein v. Kramer Bros. Freight Lines, Inc., 133 F.2d 143, 145-46 (3d Cir. 1943); Amalgamated Cotton Garment and Allied Indus. Fund v. Campolong, 463 A.2d 1129, 1130-31 (Pa. Super. Ct. 1983); Philadelphia Auburn-Cord Co. v. Shockcor, 2 A.2d 501, 501 (Pa. Super. Ct. 1938); Macan v. Scandinavia Belting Co., 107 A. 750, 752-53 (Pa. 1919). While Pennsylvania's courts have also adopted the control of litigation rule, First Options cites no Pennsylvania
authority that has applied the rule to a closely held corporation. Rather, Pennsylvania seems to have rejected the position taken in the Restatement (Second) of Judgments that a judgment against a closely held corporation is conclusive against the corporation's stockholders. See Restatement (Second) of Judgments S 59(3) (1982); Macan, 107 A. at 752-53 (refusing to hold that a corporation's prior litigation was res judicata
against the corporation's largest shareholder because "[a] corporation has a separate entity or existence, irrespective of the persons who own its stock, and this rule is not altered by the fact that the greater portion
or even the entire issue of stock happens to be held by one person.").

11

that First Options claims has a preclusive effect on Kaplan's instant litigation.

In contrast to the parties' first case, this litigation was brought under the federal bankruptcy laws, and therefore the district court had jurisdiction under 28 U.S.C. S 158(a). Accordingly, this case presents the question of which law governs the preclusive effect of a prior federal court judgment rendered under diversity jurisdiction on a subsequent case arising under the bankruptcy laws. The Supreme Court addressed that question in Heiser v. Woodruff, 327 U.S. 726, 66 S.Ct. 853 (1946). The Court applied the federal law of res judicata to determine the preclusive effect of a prior diversity judgment, stating that "[i]t has been held in non-diversity cases since Erie v. Tomkins, that the federal courts will apply their own rule of res judicata." Id. at 733. Accordingly, we will apply federal preclusion principles to this case.15

_____

15. This conclusion is supported by the rationale advanced by the majority of circuits in holding that federal law governs the preclusive effect of a diversity judgment in a subsequent diversity suit. These courts
have reasoned that preclusion rules are procedural rather than substantive, and therefore the Erie doctrine does not require federal courts to apply state law. See, e.g., Hunt v. Liberty Lobby, Inc., 707 F.2d
1493, 1496 (D.C. Cir. 1983). Moreover, these courts have noted that the federal courts have a significant interest in determining the preclusive effect of federal judgments. See, e.g., Johnson v. SCA Disposal Services of New England, Inc., 931 F.2d 970, 974 n.11 (1st Cir. 1991). As the Second Circuit stated in Kern v. Hettinger, 303 F.2d 333, 340 (2d Cir. 1962):

        One of the strongest policies a court can have is that of determining
        the scope of its own judgments. . . . It would be destructive of the
        basic principles of the Federal Rules of Civil Procedure to say that
        the effect of a judgment of a federal court was governed by the law
        of the state where the court sits simply because the source of federal
        jurisdiction is diversity. . . . [I]t would be a strange doctrine to allow
        a state to nullify the judgments of federal courts constitutionally
        established and given power also to enforce state created rights.

See also, RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1290 n.11 (5th Cir.1995); Havoco of America, Ltd. v. Freeman, Atkins & Coleman, Ltd., 58 F.3d 303, 307 (7th Cir. 1995); Shoup v. Bell and Howell, Co., 872

F.2d 1178, 1179 (4th Cir. 1989); Petromanagement Corp. v. Acme-Thomas

12

Although several federal courts have held that a shareholder is bound by his corporation's prior litigation if he participated substantially in the suit, see , e.g., In re Teltronics Servs., Inc., 762 F.2d 185, 191 (2d Cir. 1985) ("A judgment against a corporation bars later litigation on the same cause of action by an officer, director, or shareholder of the corporation if the individual participated in and effectively controlled the earlier case."), we decline to apply this rule in the context of this case.

It is cardinal rule that "[a]rbitration is a matter of contract, and parties are bound by arbitration awards only if they agreed to arbitrate a matter." E.g., Teamsters Local Union No. 764 v. J.H. Merritt and Co., 770 F.2d 40, 42 (3d Cir. 1985). Applying this rule, we concluded in a previous appeal that Kaplan did not consent to the jurisdiction of the Exchange's arbitration panel, and we therefore rejected First Options' attempt to confirm the panel's decision against Kaplan in his individual capacity. See Kaplan, 19 F.3d at 1510–23. This conclusion was affirmed by the Supreme Court. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947 (1995). See also id. at 942 ("a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute.").

First Options, however, now asks us to hold that, although it has already been conclusively adjudicated that Kaplan withheld consent to be bound personally by the arbitration award or the prior judgment confirming the arbitration award against MKI, he is nevertheless bound because he controlled the prior litigation on MKI's behalf. We reject First Options' argument. Generally applicable res judicata rules must sometimes be adapted to fit the

_____

Joint Venture, 835 F.2d 1329. 1333 (10th Cir. 1988); Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1503 (11th Cir. 1984); Silcox v. United Trucking Serv., Inc., 687 F.2d 848, 852 (6th Cir. 1982); Restatement (Second) of Judgments S 87 comment b, at 317–18 (1982); Ronan E. Degnan, Federalized Res Judicata, 85 Yale L.J. 741, 769–70 (1976). However, while these authorities persuasively support our conclusion in this case, we note that this circuit has not yet decided which preclusion law it will apply in the successive-diversity context. See Venuto v. Witco Corp., 117 F.3d 754, 758 (3d Cir. 1997).

arbitration context. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 222–23 (1985); NLRB v. Yellow Freight Systems, Inc., 930 F.2d 316, 319–21 (3d Cir. 1991); General Comm. of Adjustment v. CSX Corp., 893 F.2d 584, 593 n.10 (3d Cir. 1990) ("traditional principles of stare decisis and res judicata are given significantly less weight in arbitration proceedings"); Leddy v. Standard Drywall, Inc., 875 F.2d 383, 385 (2d Cir. 1989); Kovats v. Rutgers, 749 F.2d 1041, 1048 (3d Cir. 1984).16 Moreover, we believe that First Options' argument is inconsistent with the rule that the scope of the obligation to arbitrate -- and to accept arbitral decisions -- is defined by contract. An arbitration agreement may limit its preclusive effects. See Restatement (Second) of Judgments S 84(4). Where, as in this case, a corporation agrees to arbitration but the corporation's principal and sole shareholder withholds such consent, we presume, in the absence of any contractual provision addressing the issue of res judicata in so many words, that the parties agreed that the principal and sole shareholder, who would necessarily control the corporation's participation in any arbitration proceeding or litigation, would not be bound by any arbitral award or judgment based on the theory that he or she controlled the relevant proceeding. Any other rule would render essentially meaningless the principal and sole shareholder's withholding of consent to be bound personally by the arbitral award or judgment. For these reasons, we hold that Kaplan's instant claims are not barred by res judicata.

IV.

We turn now to the merits of Kaplan's counterclaims. Kaplan asserts that First Options had no contractual right to assume control of MKI's account, evict MKI from its offices, or prevent him from running MKI's affairs. Kaplan

_____

16. Cf. McDonald v. City of West Branch, 466 U.S. 284, 287 (1984) (holding that federal courts may not apply res judicata or collateral estoppel to an unreviewed arbitration award in a case brought under 42 U.S.C. S 1983); Kremer v. Chemical Contstr. Corp., 456 U.S. 461, 477 (1982) ("Arbitration decisions . . . are not subject to the mandate of [the
Full Faith and Credit Statute].").

14

also asserts that First Options improperly dissipated MKI's assets in the process of liquidating its account. He argues that these actions breached both the express provisions of the parties' agreements and First Options' implied covenant of good faith and fair dealing. Kaplan argues that these breaches entitle him to damages and also discharge his obligation to surrender his income tax return.

We begin by considering Kaplan's breach of contract claim. We analyze a claim for breach of contract by first examining the plain language of the parties' agreements. See American Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 581 (3d Cir. 1995). Accordingly, we must look to the language of the parties' contracts to discover the extent of First Options' rights.

First Options argues that several provisions in the parties' agreements grant it unfettered discretion to liquidate MKI's account.17 The first of these provisions states:

> The undersigned [MKI] agrees to keep good, in every account in which the undersigned has an interest, a margin satisfactory to you [First Options] from time to time, and in the event that any such margin shall in your discretion be deemed insufficient, you shall have the right, whenever in your discretion you deem it necessary, to sell any or all of the undersigned's securities and other property, to buy any or all securities and other property of which the undersigned may be short, and to close out any or all outstanding contracts, all without demand for margin or additional margin.

The remaining provisions are similar:

> 4. Clearing Member [First Options] and Clearing Corporation are each hereby severally authorized

_____

17. These provisions are embodied in several contracts executed before and after the 1987 workout: (a) the Combined Market Makers', Specialists' or Registered Traders' Account Agreement dated June 1, 1987 and (b) the Market Maker's Agreements dated November 15, 1984 and June 1, 1987. As the bankruptcy court found, the two Market Maker's Agreements are identical.

15

by Member [MKI], whenever it considers it necessary for its protection, . . . to sell out or buy in any position or other asset in the Account, to cancel any open uncleared transaction, to exercise any option, and to close out the Account in whole or in part.

5. Any exercise, purchase, sale, buy in, sell out, netting, liquidation or cancellation made under this agreement, of the Account or any position or other assert therein may be made by . . . Clearing Member, . . .; according to its judgment and discretion, at public or private sale and without notice to Member.

As the bankruptcy court concluded, these provisions grant broad powers to First Options. Specifically, the provisions authorize First Options to buy assets in which the account has a short position, sell assets in the account, and close out the account entirely. Any of these actions may be taken whenever First Options deems it necessary for its protection. Accordingly, Kaplan's argument that First Options was not authorized to liquidate the account once the TET risk was eliminated is incorrect.

However, the parties' agreements do not grant First Options unlimited authority. As Kaplan asserts, the foregoing provisions do not authorize First Options to purchase new securities unless those securities are purchased to cover a short position. While the agreement states that First Options may "sell out or buy in any position or other asset in the Account," that phrase must be read in light of the parties' use of language in the agreement. The parties apparently use the phrases "sell out" and "buy in" to mean the acts of selling assets in the account and purchasing assets to cover the account's short positions. Thus, a "buy in" refers to the power to "buy any or all securities and other property of which the undersigned may be short."

Kaplan asserts that First Options "churned" the MKI account by opening new positions--i.e., purchasing new securities for which MKI did not have a short position at the time First Options assumed control. To the extent that First Options did this, it exceeded its contractual authority.

16

As discussed above, First Options did have the right to take control of and liquidate the MKI account. However, First Options' rights did not amount to the unfettered discretion of absolute ownership. Rather, the agreements state specifically what actions First Options could take to liquidate the account. The agreement's language is simply not broad enough to permit First Options to manage the account without limitation--buying and selling securities unrelated to positions in the account until the account's equity was dissipated. Kaplan offered evidence that First Options opened new positions that were unrelated to any preexisting short position.18 Accordingly, we will remand the case to allow the bankruptcy court to compare the evidence of First Options' actions to the actions specifically authorized in the agreement.

V.

Kaplan asserts that First Options' conduct not only violated the express provisions of the parties' agreements, but also breached the covenant of good faith and fair

_____

18. The bankruptcy court stated that Kaplan failed to present sufficient evidence of such "opening trades" and failed to allege that these trades decreased the value of MKI's account. See In re Kaplan, Bankr. No. 93-10625DAS at 18. This conclusion may well be true. We express no opinion as to the sufficiency of Kaplan's evidence because the parties have not addressed the issue, First Options has not asserted it as an alternative basis for affirmance, and we believe that the bankruptcy court is better suited to compare the evidence with the parties' contracts since it presided over the trial and is familiar with the complex stock-trading documentation at issue. Given our conclusion that First Options did not enjoy unlimited discretion under the parties' contracts, we remand to allow the bankruptcy court to compare the evidence supporting Kaplan's various allegations to the specific actions permitted by the parties' contracts. This comparison need not be limited to opening trades but could involve any unauthorized activities.

Lastly, we note that the bankruptcy court's statement regarding Kaplan's evidence assumes that, once Kaplan proves a breach of the parties' promises, his damages are to be measured by the value of MKI's account. As previously noted, we do not decide the proper measure of Kaplan's damages, and we therefore express no opinion on the validity of this assumption. See supra n.10.

17

dealing implied in every contract. The district court correctly stated the law on the implied covenant of good faith and fair dealing:

> [U]nder Illinois law, a covenant to deal fairly and in good faith is implied in every contract. Saunders v. Michigan Ave. Nat'l Bank, 278 Ill. App. 3d 307, 622 N.E.2d 602, appeal denied, 167 Ill.2d 569, 667 N.E. 2d 1063 (1996); Northern Trust Co. v. VII Michigan Assoc., 276 Ill. App. 3d 355, 657 N.E.2d 1095 (1995); Abbott v. Amoco Oil Co., 249 Ill.App.3d 774, 619 N.E.2d 789 (1993), appeal denied, 153 Ill.2d 968 (1985). Moreover, this duty requires the party vested with discretion under the contract `to exercise that discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.' Saunders, 662 N.E.2d 602 (quoting Dayan v. McDonald's Corp., 125 Ill.App.3d 972, 991, 466 N.E.2d 958, 972 (1984)).

In re Kaplan, Civ. Action No. 95-95-6040 at 20.

The bankruptcy and district courts rejected Kaplan's bad faith claim because they concluded that First Options' actions in closing the account were specifically authorized by the parties' agreements. The bankruptcy court stated that First Options' "right to take control of the Account was practically unfettered and in its sole discretion" and that "[n]othing in the Workout Agreement purported to limit or qualify in any way [First Options'] rights under the Account Agreements." In re Kaplan, Bankr. No. 93-10625DAS at 14-15, 24. Accordingly, although the bankruptcy court stated that First Options' actions were "unorthodox and not consistent with industry practice" and "were possibly tainted by personal animus," it concluded that Kaplan's claim lacked merit. Id., at 24-25.

We agree with the lower courts' conclusion that the language of the parties' agreements protects First Options' interest in the account by granting it extraordinarily broad discretion to eliminate risk and close the account. However, the agreements do not give First Options the right to act in bad faith or in a commercially unreasonable manner. The

18

relationship between a margin account customer and broker is generally that of a pledgor and pledgee. See In re Rosenbaum Grain Corp., 103 F.2d 656, 661 (7th Cir. 1939); Restatement of Security S 12 (1941). Accordingly, while the pledgee may have a discretionary right to liquidate the margined securities, it must do so in good faith and in a commercially reasonable manner. See Modern Settings, Inc. v. Prudential–Bache Sec. Inc., 936 F.2d 640, 644 (2d Cir. 1991) (holding that the discretionary right to liquidate a securities account must be exercised in good faith); (citing Cauble v. Mabon Nugent & Co., 594 F. Supp. 985, 992 (S.D.N.Y. 1984)). Accordingly, First Options' argument that it has "absolute discretion to control risk stemming from the accounts of its customers, including MKI" is incorrect insofar as it claims a right to liquidate MKI's account in bad faith or in a commercially unreasonable manner.19

It is true that the obligation of good faith and fair dealing cannot be used to negate specific contractual powers, even if the exercise of those powers causes harsh results. See Olmos v. Golding, 736 F. Supp. 1472, 1479 n.5 (N.D. Ill 1989); Continental Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir. 1992). "Parties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith: express covenants abrogate the operation of implied so courts will not permit implied agreements to overrule or modify the express contract of the parties." RTC v. Holtzman, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993). "When a contract is silent, principles of good faith . . . fill the gap. They do not block the use of terms that actually appear in the contract." Kham & Nates Shoes No.2, Inc. v. First Bank, 908 F.2d 1351, 1357 (7th Cir. 1990). However, in this case the language of the parties agreements provides that First Options may, in its discretion, buy in, sell out, or close out the account. Since one purpose of the implied

_____

19. The Seventh Circuit has stated that Illinois does not recognize an action for breach of the implied covenant independent of a breach of contract claim. Continental Bank, 964 F.2d at 705. However, as discussed above, Kaplan has brought a viable breach of contract claim alleging that First Options churned the account by opening and closing new positions not represented in the account at the time First Options assumed its management.

19

covenant of good faith is to "check the exercise of a party's discretion under a contract," Bane v. Ferguson, 707 F. Supp. 988, 994 (N.D. Ill 1989), aff'd, 890 F.2d 11 (7th Cir. 1989); see also Dayan, 466 N.E.2d at 972, First Options' discretion to take these actions is subject to the requirement that it exercise that discretion in good faith. Moreover, while it is true that the implied covenant will not negate or modify express terms, the terms in the parties' contracts leave great room for discretion and thus for the application of the implied covenant.

First Options points out that the bankruptcy court's opinion contains some language indicating that it did not act in bad faith. However, those statements are in tension with the court's statements that First Options' actions were unorthodox and possibly tainted by personal animus and with the statement that Kaplan's expectations were"not necessarily unreasonable." As noted above, the duty of good faith and fair dealing requires that a party exercise its discretion "reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." In re Kaplan, Civ. Action No. 95-95-6040 at 20. Accordingly, since First Options enjoyed a qualified discretion to take control of and liquidate MKI's account, we will remand to allow the lower courts to consider whether First Options exercised its discretion in good faith.

VI.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

20