

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-13-1999

# Paramount Aviation v. Agusta

Precedential or Non-Precedential:

Docket 98-6257

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Paramount Aviation v. Agusta" (1999). *1999 Decisions.* Paper 122.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/122

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 13, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-6257

PARAMOUNT AVIATION CORPORATION,
Appellant

v.

GRUPPO AGUSTA; AGUSTA AEROSPACE
CORPORATION; COSTRUZIONI AERONAUTICHE
GIOVANNI, Augusta, S.P.A.; AUGUSTA, S.P.A.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 91-cv-04954)
District Judge: Honorable John W. Bissell

Argued: March 25, 1999

Before: BECKER, Chief Judge, LEWIS and
WELLFORD,* Circuit Judges.

(Filed May 13, 1999)

        CATHERINE B. SLAVIN, ESQUIRE
         (ARGUED)
        Wolk & Genter
        1710-12 Locust Street
        Philadelphia, PA 19103

Counsel for Appellant

_____

*Honorable Harry Wellford, United States Circuit Judge for the United
States Court of Appeals for the Sixth Circuit, sitting by designation.

JOHN R. ALTIERI, ESQUIRE
  (ARGUED)
Foglia & Altieri
25 East Salem Street
Hackensack, NJ 07601

RUDOLPH V. PINO, JR., ESQUIRE
JOANNA ROBERTO, ESQUIRE
PINO & ASSOCIATES
Westchester Financial Center
White Plains, NY 10606

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

New Jersey's entire controversy doctrine is an extremely robust claim preclusion device that requires adversaries to join all possible claims stemming from an event or series of events in one suit. Animated by the laudable goal of easing the burdens of excessive litigation, the doctrine was developed in the domestic context, precluding suits in New Jersey courts based on disputes that were previously the subject of litigation in New Jersey courts. It has attained interjurisdictional proportions, however, and has been used in New Jersey to preclude claims based on a failure to effect joinder in previous litigation in non-New Jersey courts, where such joinder was not required by those courts' own rules. The repercussions of the doctrine have prompted adverse scholarly comment. See generally Symposium: Entire Controversy Doctrine, 28 Rutgers L.J. 1 (1996).1

This case began with a helicopter crash, though the facts have little bearing on the issue before us. We must decide whether a federal court in New Jersey should, when

_____

1. Until quite recently the entire controversy doctrine required party as well as claim joinder. The party joinder aspect of the doctrine, the focus of the lion's share of the criticism, has now been eliminated. See N.J. R. Civ. Pro. 4:30A. However, the interjurisdictional claim preclusion problem, also the subject of considerable scholarly criticism, remains.

2

exercising its diversity jurisdiction, apply the entire controversy doctrine to bar the plaintiff from asserting claims against the defendants because they were not asserted in prior litigation involving the instant parties and others in federal courts in Pennsylvania, New York, and New Jersey. We conclude that we should not. Disagreeing with the District Court, which barred the plaintiff 's claim, we hold that federal courts should apply the general rule that the preclusive effect of a judgment is determined by the preclusion law of the issuing court--in this case, a federal court. We will, therefore, reverse the District Court's grant of summary judgment to the defendants on the plaintiff 's tort claims and remand for further proceedings. We will also uphold the District Court's determination of the amount owed to defendant Agusta Aerospace Corporation ("AAC") on its counterclaims, but we will vacate the judgment on the counterclaims pending disposition of Paramount's tort claims.

I. Facts and Procedural History

On October 10, 1989, an Agusta 109A helicopter crashed in New Jersey, killing the pilot, co-pilot, and three passengers, who were top-echelon employees of the Trump Hotel and Casino enterprises. The helicopter was manufactured by Costruzioni Aeronautiche Giovanni Agusta ("CAGA") and purchased by AAC. CAGA is a subsidiary of Agusta S.p.A. and a part of Gruppo Agusta. AAC is CAGA's wholly-owned U.S. subsidiary. These are the "Agusta defendants." AAC sold the helicopter to Clifton Park Association, which sold it to FSQ Air Charter Corporation ("FSQ"). Paramount Aviation, Inc. ("Paramount") arranged for this sale to FSQ and contracted with FSQ to manage the aircraft and to supply one of the two pilots who operated it.

The first lawsuit arising from the crash was Kent v. Costruzioni Aeronautiche Giovanni Agusta, Gruppo Agusta, Agusta Aviation Corp., & Paramount Aviation, Inc. ("Kent"), filed in the United States District Court for the Eastern District of Pennsylvania, on March 30, 1990, by the widow and estate of co-pilot Robert Kent. The Agusta defendants filed answers asserting cross-claims against Paramount for contribution and indemnification, and Paramount's answer

3

included cross-claims against the Agusta defendants for contribution and indemnification, but no affirmative claims. This case settled on November 27, 1990, for $3,150,000, of which the Agusta defendants paid $2,900,000 and Paramount paid $250,000.

Second came Trump Taj Mahal Assoc., Trump Castle Assoc., Trump Plaza Assoc., & Helicopter Air Services, Inc. v. Costruzioni Aeronautiche Giovanni Agusta, Agusta, Gruppo Agusta, Agusta Aviation Corp., & Paramount Aviation Corp. ("Trump"), filed in 1990 in the Superior Court of New Jersey and immediately removed to federal court. Prior to serving answers, the defendants filed motions for summary judgment, and the district court dismissed all counts, ruling that the plaintiff-employers were not entitled to recover under any of the theories they had alleged. See Trump Taj Mahal Assoc. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A., 761 F. Supp. 1143 (D.N.J. 1991), aff 'd mem., 958 F.2d 365 (3d Cir.), cert. denied, 506 U.S. 826 (1992). Paramount and the Agusta defendants asserted no cross-claims against each other, nor was there occasion for them to do so after the summary judgment motions were granted.

Next came FSQ Air Charter Corp. v. Costruzioni Aeronautiche Giovanni Agusta, Agusta, Gruppo Agusta, & Agusta Aviation Corp. ("FSQ"),filed in 1991 in the United States District Court for the Eastern District of New York. AAC filed a third-party complaint against Paramount, and Paramount answered without raising affirmative defenses or counterclaims. The parties' insurers defended the action, which was settled in June 1992 with an exchange of mutual releases that specifically excluded the claims in the case before us.

Fourth was Paramount Aviation Corp. v. Gruppo Agusta, Agusta Aviation Corp., Costruzioni Aeronautiche Giovanni Agusta, & Agusta S.p.A. ("PAC I"),filed in the United States District Court for the District of New Jersey in 1990. That complaint alleged seven counts of tortious behavior, including negligence, willful misconduct, and strict tort liability. Paramount claimed that the crash caused it adverse publicity, public hostility, loss of clients and goodwill, loss of income, and other damages. On August 16,

4

1990, the complaint was voluntarily dismissed under Federal Rule of Civil Procedure 41, without prejudice, prior to answer. Kent was still pending at that point, and Trump was on appeal.

Finally, PAC II, the instant case, was filed in New Jersey Superior Court in 1991. Alleging the same damages as PAC I, plaintiff Paramount stated two counts: (1) negligence, gross negligence, and willful and reckless misconduct; and (2) strict tort liability. Paramount claimed damages as a result of the Agusta defendants' manufacturing and design, which allegedly caused the crash. The case was removed, and the Agusta defendants (except for "Gruppo Agusta," which seems to be an umbrella name without independent corporate existence) filed answers in October 1992, while AAC also stated a counterclaim against Paramount for amounts allegedly owed for another Agusta helicopter and for payments for spare parts, service, and training. Although the complaint contained a certification about Trump and FSQ, as required by N.J. Rule 4:5-1, the Agusta defendants did not raise the entire controversy doctrine in their answers. The defendants first raised the entire controversy doctrine in February 1996 and filed a summary judgment motion on that ground in February 1997.

The District Court granted summary judgment against Paramount on its claim, reasoning that the claim was barred by the entire controversy doctrine. It then granted summary judgment for AAC on the counterclaim. Paramount appeals.

II. The Entire Controversy Doctrine

A. Introduction; The District Court's Rationale

Under the entire controversy doctrine, a party cannot withhold part of a controversy for separate later litigation even when the withheld component is a separate and independently cognizable cause of action. The doctrine has three purposes: (1) complete and final disposition of cases through avoidance of piecemeal decisions; (2) fairness to parties to an action and to others with a material interest in it; and (3) efficiency and avoidance of waste and delay. See DiTrolio v. Antiles, 662 A.2d 494, 502 (N.J. 1995). As an

equitable doctrine, its application is flexible, with a case-by-case appreciation for fairness to the parties.

The entire controversy doctrine is an affirmative defense, waived if not pleaded or otherwise timely raised. See Brown v. Brown, 506 A.2d 29, 35 (N.J. Super. Ct. App. Div. 1986). Notwithstanding that principle, the District Court held that failure to raise the doctrine in a responsive pleading should be viewed in light of the federal policy of liberally allowing amendments if the issue was raised at a pragmatically sufficient time. See Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1374 (3d Cir. 1993). Although the defendants had not formally raised the entire controversy defense until their motion for summary judgment, filed in 1997, the District Court decided that it would have granted leave to amend the pleadings to assert it. See id. at 1374; see also Burrell v. Quaranta, 612 A.2d 379 (N.J. Super. Ct. App. Div. 1992) (entire controversy defense was not foreclosed where the trial judge would have granted leave to amend the pleading if asked).

The District Court further determined that Paramount was not prejudiced by this decision. The court reasoned that, given the lengthy history of litigation over the crash, the application of the doctrine could not have been unforeseen. Moreover, the court concluded that the long delay between the filing of the complaint and the motion for summary judgment was not prejudicial because it was largely the result of Paramount's failure to prosecute the action vigorously.2 The court further found that the Kent litigation offered Paramount an opportunity to bring its claim against the Agusta defendants; Paramount had brought cross-claims for contribution and indemnification in that case.

Paramount argued that the doctrine should not apply when all the previous actions, as well as the instant one, were federal, but the District Court reasoned that the doctrine had routinely been applied in federal court. See, e.g., Petrocelli v. Daniel Woodhead Co., 993 F.2d 27 (3d Cir.

_____

2. The parties strenuously dispute the causes and effects of the delay, but, as we need not reach the issue, we will not address it in greater detail.

1993). Paramount maintained that the doctrine was procedural. The court responded that it was not "procedural" simply because it was codified in a rule of procedure; as a creature of state common law, the entire controversy doctrine was to be applied federally under the rule of Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

Paramount urges that the District Court abused its discretion in its application of the equitable considerations behind the entire controversy doctrine. The District Court, of course, has great discretion in matters of this sort. However, we need not reach the issue, because wefind that the entire controversy doctrine is not the right preclusion doctrine for a federal court to apply when prior judgments were not entered by the courts of New Jersey.

B. Foreign Application of the Entire Controversy Doctrine

In order to decide whether to apply New Jersey law or federal law, we must follow the rules laid down in Erie and its progeny. We are required to weigh the significance and substantive character of the state preclusion rule, and the likelihood that application of the federal rule would produce forum-shopping by parties, against the importance of the federal interests underlying the federal rule. See Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S. 525, 535-40 (1958). If a rule is outcome-determinative, so that applying the federal rule would change the result of a casefiled in federal court from the result in an identical state court case, it is likely to affect parties' decisions where to litigate, and applying the state rule is generally appropriate. On the other side, a strong federal policy embodied in constitutional principles or federal law justifies the application of a federal rule. In this case, the relevant federal interests are embodied in Federal Rule of Civil Procedure 13, which establishes federal claim joinder rules, and in federal principles of res judicata. We conclude that New Jersey's interest in the entire controversy doctrine, while weighty, does not require us to adopt it in order to decide the preclusive effects of non-New Jersey cases.

7

### 1. The Parties' Contentions

Paramount notes that none of the lawsuits filed in the aftermath of the accident was litigated in New Jersey state court (three were brought in federal court and two were removed).[3] It argues that the New Jersey Rules of Court containing the entire controversy doctrine are procedural and therefore should not be applied in federal court. Paramount also submits that New Jersey's interest in preserving the resources of its courts is minimal, if not absent, here, where all of the prior cases were litigated outside of the New Jersey courts. See Henkels & McCoy, Inc. v. Adochio, 906 F. Supp. 244, 249 (E.D. Pa. 1995) (declining to apply the doctrine where both the previous case and the instant case were in the Eastern District of Pennsylvania).

Paramount further contends that, when a prior decision's preclusive effect is examined, it is the prior jurisdiction's preclusion law that should generally be applied. See Restatement (Second) of Judgments S 87 (1982). Paramount reasons that federal preclusion law should apply to determine the preclusive effects of federal diversity judgments. In the absence of a prior New Jersey judgment on the merits, Paramount maintains, we have no reason to apply New Jersey's supercharged preclusion doctrine.

The defendants respond that the Full Faith and Credit Act, 28 U.S.C. S 1738 (1994), requires a federal court hearing a New Jersey tort claim to be bound by New Jersey

_____

3. Paramount submits, and the Agusta defendants do not challenge, that the fact that actions were originally commenced in state court is irrelevant. Once removed, jurisdiction in the District Court is original and federal procedure applies. Moreover, the state courts have expended negligible resources on the removed case; New Jersey courts do not apply the doctrine when a prior case was pending for only a few days and no notable activity took place. Cf. Hulmes v. Honda Motor Co., 924 F. Supp. 673 (D.N.J. 1996) (declining to apply the doctrine when the first action was only pending in New Jersey state court for one week before its voluntary dismissal); Karpovich v. Barbarula, 696 A.2d 659 (N.J. 1997) (holding that a settlement did not require application of the doctrine where there were only seven days between the state court filing and the entry of a consent judgment and virtually no judicial resources were used).

substantive law, of which the entire controversy doctrine is a part. See Rycoline Prods., Inc. v. C&W Unltd., 109 F.3d 883, 887 (3d Cir. 1997). We note some initial discomfort with this description, as we believe that the entire controversy doctrine, like all preclusion doctrine, should generally be characterized as procedural. We take up Rycoline and the substance/procedure divide infra, noting here only that the Supreme Court has long instructed us that the substance/procedure line is not dispositive when federal courts must choose which sovereign's law to apply. See Guaranty Trust Co. v. York, 326 U.S. 99 (1945).

The defendants also point out that federal courts have occasionally applied the entire controversy doctrine to determine the effects of non-New Jersey judgments, but the parties in prior decisions have not contested the application of the doctrine.[4] Nor have we resolved the broader issue of whether federal or state res judicata law governs successive diversity actions. See Venuto v. Witco Corp., 117 F.3d 754, 758 & n.7 (3d Cir. 1997). We have, however, decided that federal law governs the preclusive effect of a prior diversity judgment on a subsequent federal question case. See In re Kaplan, 143 F.3d 807, 814-15 (3d Cir. 1998). We noted in Kaplan that the Supreme Court used federal law to determine the preclusive effect of a prior diversity judgment in Heiser v. Woodruff, 327 U.S. 726 (1946). Though the issue was not then before us, we also suggested that the rationale for applying federal preclusion law to determine

_____

4. The entire controversy doctrine has indeed been invoked when the previous suit was in another state or in a federal court. Melikian v. Corradetti, 791 F.2d 274 (3d Cir. 1986), applied the entire controversy doctrine, though its only preclusive effect was on a corporation that may not even have been a party to the second lawsuit. See id. at 280 & n.3. Melikian assumed that the doctrine applied to successive diversity cases in New Jersey and did not address the choice of law question. Thus, it does not control our decision today. Similarly, in Itzkoff v. F&G Realty, Corp., 890 F. Supp. 351 (D.N.J. 1995), the first action was in New York state court and the second in New Jersey federal court. The parties and the court assumed that the entire controversy doctrine governed. See Itzkoff, 890 F. Supp. at 355. The court found that New Jersey (state) courts would apply the doctrine to foreign proceedings "where fairness so required." Id. at 356. The parties did not broach the specific issue of a federal court's application of the doctrine.

the effects of a prior diversity judgment on a later federal question case was quite similar to the rationale for doing so in a later diversity case. See Kaplan, 143 F.3d at 815 n.15.

## 2. Relevant Case Law

We find two New Jersey decisions particularly helpful in elucidating New Jersey's view of the entire controversy doctrine. In Watkins v. Resorts International Hotel & Casino, Inc., 591 A.2d 592 (N.J. 1991), the New Jersey Supreme Court acknowledged the general rule that the preclusive effect of a judgment is determined by the law of the jurisdiction that rendered it, as a logical consequence of the procedures of the issuing court. See id. at 598. This rule affects the application of the entire controversy doctrine in New Jersey state court. Only in "limited circumstances" may the doctrine preclude an action not otherwise precluded by the res judicata effects of a federal decision. See id. at 598-99. The court held that it was essential to consider the federal law of claim preclusion in determining whether to apply the entire controversy doctrine, as an equitable matter, in state court cases. See id. at 599. Watkins thus suggests that New Jersey recognizes the interests of other jurisdictions that have differing preclusion doctrines.

In Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co., 662 A.2d 536 (N.J. 1995), the New Jersey Supreme Court applied the entire controversy doctrine to a plaintiff who had previously sued on the same underlying facts in the federal District Court for the Eastern District of Pennsylvania. Almost a year earlier, a mortgage lender had brought an action in the latter court against Pennsylvania-based companies and individuals who were allegedly the central figures in a fraudulent scheme involving mortgage financing, and the Federal Home Loan Mortgage Corporation ("Fannie Mae") had intervened as a plaintiff. The second case was brought in New Jersey state court by the lender and Fannie Mae against New Jersey-based companies and individuals who participated in the same mortgage transactions and who were allegedly accessories in the same scheme.

10

Mortgagelinq stated decisively that the entire controversy doctrine is procedural, and that it was formulated specifically to preserve the resources of New Jersey courts.5 The Court held that the doctrine bars suits in New Jersey against parties who could have been joined in an earlier suit in another state or in federal court. The result was binding only in New Jersey, however; other jurisdictions could permit litigation against earlier-omitted defendants despite a New Jersey decision dismissing an action on entire controversy grounds. The decision thus attempted to cabin the effect of the doctrine outside of New Jersey courts:

> We hold that when a party deliberately chooses to fragment litigation by suing certain parties in another jurisdiction and withholds claims against other parties, a New Jersey court need not later entertain the claims against the omitted parties if jurisdiction was available in the first forum. In doing so we do not export our entire controversy doctrine to other jurisdictions, but merely hold that our notions of procedural fairness do not permit the claims that could have been brought elsewhere to be brought in New Jersey. This ruling presupposes that when the procedural rules of foreign jurisdictions permit the omitted claims to be brought later, the foreign jurisdiction is free to entertain such claims. Just as we do not seek to export our procedural requirements of party joinder, we do not seek to export any preclusive effect to our rules of party joinder.

> . . . .

_____

5. Guaranty Trust Co. announced that"[i]t is . . . immaterial whether statutes of limitation are characterized either as`substantive' or `procedural' in State court opinions in any use of those terms unrelated to the specific [Erie] issue before us." Guaranty Trust Co., 326 U.S. at 109. Mortgagelinq, however, is intimately related to the choice of law issue, and thus we do not believe that Justice Frankfurter's conclusion precludes us from considering that case. More importantly, we believe that Watkins and Mortgagelinq provide insight into the scope of New Jersey's interest in its doctrine, an issue that is distinct from the doctrine's location on the substance/procedure line.

11

One of the underpinnings of the entire controversy doctrine, in addition to fairness to the parties, is fairness to the system of judicial administration. "Judicial economy and efficiency--the avoidance of waste and delay--remain constants in the application of the entire controversy doctrine. Fragmented and multiple litigation takes its toll on not only the parties but the judicial institution and the public." Each jurisdiction is free to assess the importance of such values. . . .

If Pennsylvania courts do not have a comparable party-joinder rule, principles of comity suggest that New Jersey should not seek to export its entire controversy doctrine to regulate the conduct of attorneys in that jurisdiction. In other words, attorneys conducting litigation in Pennsylvania courts should not have to accommodate their practices to the demands of New Jersey courts. A corollary of that proposition, however, is that New Jersey courts need not necessarily grant relief when parties deliberately refrain from seeking relief in other jurisdictions when doing so would have been much fairer to all parties involved. There is a delicate balance between the interests of the two jurisdictions that must accommodate the interests of justice. . . .

. . . .

Maintaining a cohesive federal system (and the Full Faith and Credit Clause melds the state courts into that system) does not require that the other parts of the federal system honor our entire controversy doctrine.

Mortgagelinq, 662 A.2d at 537, 540, 541, 542 (citations omitted).

The Mortgagelinq court mentioned that "the federal courts are considered those of another sovereign," id. at 541, and suggested that the application of the doctrine in a diversity action in New Jersey federal court might be governed by choice of law principles, indicating that the court did not necessarily expect federal courts in New Jersey to apply the doctrine exactly as the state courts would. See id. at 542.

12

Thus, while Mortgagelinq continued to embrace an expansive view of the doctrine within New Jersey state courts, it heralded an awareness of the doctrine's limits when interjurisdictional problems were involved. While New Jersey cannot, of course, control our understanding of the relevant federal law, we consider Watkins and Mortgagelinq useful explications of the justifications for the doctrine, and hence of New Jersey's interests. We turn, therefore, to an assesment of the relevant state and federal interests.

### 3. Analysis of the Relevant State and Federal Interests

#### a. The Import of Rycoline

Rycoline held that a federal court deciding a federal cause of action is bound by the entire controversy doctrine when determining the effect of a prior New Jersey state court judgment. The court characterized the doctrine as "an aspect of the substantive law of New Jersey, by virtue of the Full Faith and Credit Act." Rycoline, 109 F.3d at 887. Thus, the plaintiffs, who had filed a previous suit in New Jersey state court, were subject to the rigors of the entire controversy doctrine when they filed a second suit in New Jersey federal court, although they were able to proceed because we decided that New Jersey would not apply the doctrine while the first suit was still pending.

The defendants claim that the just-quoted phrase from Rycoline obligates us to apply the entire controversy doctrine as part of New Jersey substantive law under Erie. We believe that the question is slightly more complex. The Full Faith and Credit Act provides that the judicial proceedings of a state court shall have the same full faith and credit within every court in the United States as they have by law or usage in the courts of the issuing state. Thus, federal courts must give the same preclusive effect to a state court judgment as another court of that state would, unless to do so would violate due process. See Rycoline, 109 F.3d at 887. In this case, there are only federal judgments, and the Full Faith and Credit Act is not by its terms applicable. It is usually thought that federal judgments receive full faith and credit by virtue of federal common law. See, e.g., Ronan Degnan, Federalized Res

13

Judicata, 85 Yale L.J. 741, 744–50 (1976) (discussing the development of the rule requiring respect for federal judgments); cf. Embry v. Palmer, 107 U.S. 3, 10 (1883) ("[T]he judgments of the courts of the United States have invariably been recognized as upon the same footing, so far as concerns the obligation created by them, with domestic judgments of the states, wherever rendered and whereever [sic] sought to be enforced.").

To the extent that Rycoline labelled the entire controversy doctrine "substantive" for purposes of the Full Faith and Credit Act, we conclude that it meant only that New Jersey law governed the preclusive effects of an earlier New Jersey state court judgment. This is exactly what the Act requires. See University of Tennessee v. Elliott, 478 U.S. 788, 794 (1986). We decline to read one phrase in a decision that depended on completely different issues as determining the result in this case. Rather, our interpretation of Rycoline renders it consistent with the long line of New Jersey cases labelling the entire controversy doctrine "procedural." See, e.g., Oliver v. Ambrose, 705 A.2d 742, 746 (N.J. 1998); Harley Davidson Motor Co. v. Advance Die Casting, Inc., 696 A.2d 666, 668 (N.J. 1997); Mortgagelinq; Woodward–Clyde Consultants v. Chemical & Pollution Sciences, Inc. , 523 A.2d 131, 135 (N.J. 1987). At all events, the substance/procedure divide is not necessarily the controlling factor in determining when a federal court must apply state law. See Guaranty Trust Co., 326 U.S. at 109–10.

Under Mortgagelinq, a dismissal on entire controversy grounds is not a dismissal on the merits; this rule helps to ensure that the doctrine will not have untoward extraterritorial effects.6 However, New Jersey law still

_____

6. The characterization of an entire controversy–based dismissal as one not on the merits only matters when the prior decision to which New Jersey applies the doctrine is not handed down by a New Jersey state court. When the first decision issues from a New Jersey court, that case carries its own preclusive effect, deserving of full respect in the courts of
other jurisdictions. If there is a second New Jersey case that is dismissed
on entire controversy grounds, and then a third federal case, we might also give the second New Jersey case preclusive effect on the issue of the

14

determines the preclusive effects of a prior New Jersey state court judgment on the merits, as in Rycoline.

  b. New Jersey's Interests and the Risks of Forum-
  Shopping

New Jersey's main justification for the doctrine, its interest in preserving its judicial resources, is minimized when none of the prior litigation took place in New Jersey state courts. See Rochelle Cooper Dreyfuss & Linda J. Silberman, Interjurisdictional Implications of the Entire Controversy Doctrine, 28 Rutgers L.J. 123, 156 (1996). New Jersey state courts still apply the doctrine in such cases, which conserves some of New Jersey's judicial resources by precluding subsequent litigation in New Jersey. By contrast, when both prior and subsequent litigation takes place outside the New Jersey state courts, it is hard to see any New Jersey resource interest whatsoever, except inasmuch as the size of the federal docket indirectly affects the state courts.

The risk of unfair surprise is also heightened where the initial litigation did not take place in New Jersey; it may be difficult for responsible lawyers to predict that litigation in New York or California will close the New Jersey federal courts to future claims. See id. at 169; cf. Electro-Miniatures Corp. v. Wendon Co., 889 F.2d 41, 45 & n.6 (3d Cir. 1989) (expressing the concern that, if the entire controversy doctrine were applied to out-of-state judgments in New Jersey federal court, other jurisdictions would be adversely affected by the need to tailor litigation to avoid preclusion in New Jersey). But see Perry Dane, Dignity and Glorious Chaos: A Comment on the Interjurisdictional Implications of the Entire Controversy Doctrine, 28 Rutgers L.J. 173 (1996) (arguing that the problems with the doctrine are overstated). Given New Jersey's recognition, in Watkins and

_____

application of the entire controversy doctrine to the facts, see 18 Wright et al., Federal Practice & Procedure S 4418, at 171 (1981) (discussing the preclusive effects of determinations that do not go to the merits), but we need not delve further into these murky preclusion waters to decide the case before us.

Mortgagelinq, that other jurisdictions have significantly different preclusion doctrines and a strong interest in giving effect to those doctrines, we do not believe that a decision requiring federal courts to apply federal preclusion law would depreciate New Jersey law.

Some commentators have argued that Mortgagelinq was wrongly decided and that the Full Faith and Credit Act does not give New Jersey the freedom to give other courts' decisions greater preclusive effect than those courts would allow. See Stephen B. Burbank, Where's the Beef? The Interjurisdictional Effects of New Jersey's Entire Controversy Doctrine, 28 Rutgers L.J. 87 (1996). Professor Burbank argues that Mortgagelinq works against the compelling interest in national unity by requiring litigants in other states to consider the preclusive effects of their cases on future cases in New Jersey, regardless of the preclusion law of the state in which they file complaints. He concludes that, regardless of New Jersey state court practice, federal courts in New Jersey should apply standard preclusion law, rather than the entire controversy doctrine, to the judgments of non-New Jersey courts. See Burbank, supra, at 100-01; see also Dreyfuss & Silberman, supra, at 157-58.

Professor Burbank further argues that, when a federal court in New Jersey tries to resolve this conundrum, it should apply the Full Faith and Credit Act rather than Erie balancing. Judicial balancing would be unnecessary, because Congress has explicitly instructed courts how to treat the judgments of state courts. See Burbank, supra, at 103 n.82. Thus, if the previous litigation involved in this case had taken place in a state court, we would, as a matter of course, give it the preclusive effect it would have in that state's courts.

Though we find this argument persuasive, it does not dispose of this case, because the Full Faith and Credit Act does not by its terms apply here. When the prior decision is a federal decision, the Act applies only by analogy. And in that case, it is important to look to Erie principles to decide which sovereign's law to apply. The Full Faith and Credit Act has an important implication, however: If the Act instructs New Jersey federal courts how to determine the

16

preclusive effect of state decisions, there is a compelling argument for treating federal cases similarly. There is no good reason to apply New Jersey entire controversy law to determine the preclusive effects of a federal diversity case from Pennsylvania when the preclusive effects of the same case would have been governed by the law of the issuing court if it had been litigated in Pennsylvania state court. To make different rules for the two types of cases would be absurd, and would only move the potential forum-shopping problem back one level further, to the initial non-New Jersey litigation.

We note another factor that diminishes the force of the Erie concerns that generally lead to application of state law. Our Erie jurisprudence counsels us to avoid situations in which parties who can invoke federal jurisdiction are treated differently from those who cannot. Because we are considering a preclusion doctrine, the question is whether parties who can invoke federal jurisdiction will be able to litigate claims that will be precluded for parties who cannot. The risk of inequitable preclusion is minimal, for the following reason: This situation arises only when there has been previous litigation outside the New Jersey state courts. However, the entire controversy doctrine would only bar a subsequent New Jersey suit if the first forum would have had jurisdiction over the claims raised in that subsequent suit. It therefore follows that there was an alternate non-New Jersey forum for the relevant claims, although in some cases that forum would be another state court. The relevant point is that no plaintiff in this situation will find itself entirely unable to litigate its claims; even if it is not able to take advantage of federal jurisdiction, it will have another state in which to bring its claims.7

_____

7. It is possible, of course, that a party who has already participated in a foreign lawsuit will mistakenly file a second suit in New Jersey state court and will lose on entire controversy grounds after the statute of limitations for filing a claim elsewhere has run, although it is not entirely
clear that a plaintiff in such a situation would be subject to the doctrine.
See Erenberg v. Cordero, 683 A.2d 567, 574 (N.J. Super Ct. App. Div. 1996) (Stern, J., concurring) (stating that the doctrine should only be applied to the judgments of foreign courts if the plaintiff 's claim is actually capable of being litigated in some non-New Jersey court). After

Any resulting disparity is no more than the disparity
created by the very existence of diversity jurisdiction, which
allows some parties the option of going to federal court
whereas others with identical causes of action cannot.8
While a decision to apply federal preclusion law would be
outcome-determinative in this case, therefore, it would not
ex ante cut off or extend any substantive rights that a
plaintiff would have in the absence of a New Jersey federal
forum, and would be unlikely to encourage significant
forum-shopping.9

Our analysis can be summarized as follows: New Jersey
has no significant interest in controlling the dockets of
other court systems. Moreover, application of a federal rule
in the rather unusual circumstances here would be
unlikely to create unfairness by causing different results in

_____

our decision, a plaintiff who files in New Jersey federal court will not
be
"mistaken," and will not face this dilemma. Thus, there is a possibility
that results will differ in some cases. However, Erie rules were designed
to avoid conscious forum-shopping, not to increase the risks of
carelessness or unfamiliarity with state law.

8. The decision to apply federal preclusion law affects forum choice in
this sense only: A well-informed plaintiff might be able to split claims
between some foreign court and a New Jersey federal court that, if the
federal court applied the entire controversy doctrine, it would otherwise
consolidate in the foreign court. But this is not the forum-shopping
between state and federal court that Erie decried; it is claim-splitting,
which presents different issues. As long as the plaintiff adheres to the
other jurisdictions' rules of joinder, we do not think that any inequity
has occurred. It is theoretically possible that variations between New
Jersey choice-of-law doctrines and the choice-of-law doctrines of other
jurisdictions might change the outcome on such a split claim, but we
doubt that parties will base their forum choices on such exotic
possibilities.

9. Relatedly, the forum-shopping concern is diminished simply because
successive litigation is less common than litigation in the first
instance;
there are many factors that go into a decision to file a second lawsuit,
and we doubt that a decision to apply federal preclusion law will
substantially alter the relevant incentives. In this case, Paramount was
not even the initial plaintiff in the pre-PAC lawsuits; in a real sense,
Paramount had very little choice over those fora, even though it filed
counterclaims and cross-claims.

federal court than in state court or to cause significant forum-shopping. The issues of outcome-determinativeness and a consequent incentive to forum-shop are not free from doubt, however. Therefore, it is important for us to determine whether there is a significant federal interest counseling application of the federal rule. See Fauber v. KEM Transp. & Equip. Co., 876 F.2d 327, 331 (3d Cir. 1989). It is to this question that we now turn.

### c. The Federal Interest

Federal courts have a significant interest in determining the preclusive effects of federal judgments. See Kaplan, 143 F.3d at 815 n.15 (citing cases). Kaplan applied federal law to determine the preclusive effects of a diversity judgment on a subsequent federal question case. We believe that its logic is equally applicable here, when successive diversity cases are at issue. The source of federal jurisdiction over the second case should not affect our analysis, because we are concerned with the preclusive effect of the first. As the Second Circuit has put it:

> One of the strongest policies a court can have is that of determining the scope of its own judgments. . . . It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity.

Kern v. Hettinger, 303 F.2d 333, 340 (2d Cir. 1962). We agree.

Paramount persuasively argues that we should apply the general federal rule that the preclusive effects of prior cases are determined by the law of the prior forum. Applying the federal rule would also give effect to the joinder rules of the Federal Rules of Civil Procedure, which define the claims that parties must join if they are not to be later barred. Cf. Hanna v. Plumer, 380 U.S. 460 (1965) (the strong federal policies embodied in the Federal Rules of Civil Procedure justify a refusal to apply an outcome-determinative state procedural rule); Byrd (outcome-determinative state procedural rules do not need to be applied when they are

19

not an integral part of the underlying substantive right and there is a strong countervailing federal policy, such as the policy against disrupting the allocation of power between judge and jury in federal court). Paramount draws further support from the scholarly opinion in Fioriglio v. City of Atlantic City, 963 F. Supp. 415 (D.N.J. 1997), which engaged in a calculus similar to ours; Judge Irenas concluded, as we do, that federal joinder and preclusion rules embody an important federal policy that weighs heavily against applying the entire controversy doctrine in these circumstances. See id. at 424.

### d. Summary and Conclusion

We conclude that respecting courts' power to determine the preclusive effects of their own rulings is a significant federal interest. In particular, the claim joinder provisions of the Federal Rules of Civil Procedure express a federal policy about what claims must be joined to avoid later preclusion. Applying New Jersey preclusion law to determine the preclusive effects of federal cases would frustrate the policy embodied in the Rules, and we decline to do so. Instead we will follow the federal rule that the law of the issuing court—here, federal law—determines the preclusive effects of a prior judgment.[10]

In reaching this result, clearly foreshadowed by Kaplan, we follow the majority of circuits to confront the issue of the law to be applied in successive diversity cases. See, e.g., J.Z.G. Resources, Inc. v. Shelby Ins. Co., 84 F.3d 211, 213–14 (6th Cir. 1996); Havoco, Ltd. v. Freeman, Atkins & Coleman, Ltd., 58 F.3d 303, 307–08 (7th Cir. 1995); Johnson v. SCA Disposal Servs., 931 F.2d 970, 974 (1st Cir. 1991); Empire Fire & Marine Ins. Co. v. J. Transport, Inc., 880 F.2d 1291, 1293 n.2 (11th Cir. 1989); Shoup v. Bell & Howell Co., 872 F.2d 1178, 1179 (4th Cir. 1989); Aerojet–General Corp. v. Askew, 511 F.2d 710, 715–18 (5th Cir. 1975); Kern, 303 F.2d at 340 (Second Circuit). But see Follette v. Wal–Mart Stores, Inc., 41 F.3d 1234, 1237 (8th

_____

10. We need not resolve here whether particular aspects of preclusion, such as privity, are "substantive" and are governed by state law. Cf. Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 962 n.2 (3d Cir. 1991).

20

Cir. 1994) (applying state law); Pardo v. Olson & Sons, Inc., 40 F.3d 1063, 1066 (9th Cir. 1994) (same).

Since we have decided that federal law, rather than the entire controversy doctrine, applies, the obvious question is: What is the federal law? However, the Agusta defendants have not argued, either in the District Court or this court, that federal preclusion principles bar Paramount's suit. We thus deem a possible res judicata argument waived. See Security Servs., Inc. v. K Mart Corp., 996 F.2d 1516, 1519 (3d Cir. 1993); Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991).11

_____

11. We doubt that such a claim would be meritorious in any event. The preclusion inquiry in this case is essentially identical to the question whether Paramount's tort claims were compulsory in any of the earlier lawsuits. See Publicis Communication v. True North Communications Inc., 132 F.3d 363, 365 (7th Cir. 1997). There is no compulsory cross-claim rule in the federal system, see Wolfe v. Safecard Servs., 873 F. Supp. 648, 649 (S.D. Fla. 1995), and therefore the Trump suit clearly does not preclude this suit.

The Kent suit raises a somewhat trickier issue, because Paramount and the Agusta defendants filed cross-claims for contribution and indemnification against one another in that case. Arguably, the filing of a cross-claim makes parties "opposing parties" within the meaning of Federal Rule of Civil Procedure 13. See Schwab v. Erie Lackawanna R.R. Co., 438 F.2d 62, 66 (3d Cir. 1971) (dicta). A conversion into "opposing party" status would imply that, although cross-claims are never compulsory in themselves, the filing of one cross-claim would trigger duties on both sides to file all claims that were compulsory under Rule 13(a). However, we suspect that a compulsory cross-claim rule would be limited to situations in which the initial cross-claim included a substantive claim, as opposed to claims for contribution and indemnity, in order to avoid needless complication of litigation. See Hall v. General Motors Corp., 647 F.2d 175, 184 (D.C. Cir. 1980); Rainbow Mgmt. Group, Ltd. v. Atlantis Submarines Hawai'i, L.P., 158 F.R.D. 656, 660 (D. Haw. 1994) (cited in 6 Wright et al., Federal Practice & Procedure S 1404, at 2 (Supp. 1997), for the proposition that filing one cross-claim turns coparties into opposing parties). But see Kane v. Magna Mixer Co., 71 F.3d 555, 562 (6th Cir. 1995) (holding that indemnity claims trigger the compulsory cross-claim rule). Thus, the cross-claims for contribution and indemnity in Kent would not likely bar the present litigation.

FSQ, in which AAC filed a third-party complaint against Paramount, raises the specter of an omitted compulsory counterclaim that would

We will therefore vacate the judgment in favor of the defendants and remand to the District Court for further proceedings on Paramount's tort claims.

III. The Counterclaims

In its counterclaims, AAC alleged that it was entitled to payments for the lease of one helicopter and for goods and services provided for three other helicopters. It presented three counterclaims, but the third counterclaim in actuality duplicated the claims of the first two, and the District Court granted summary judgment on those two. In order to prevail on summary judgment, a party stating an affirmative claim must come forward with evidence entitling it to a directed verdict. See International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir. 1991).

The first counterclaim was for $34,629 plus 1.5% interest per month for breach of a helicopter lease contract entered into on March 20, 1987, and expiring November 15, 1989. The second was for $28,159.98 plus 1.5% interest per month for breach of a contract for the sale and supply of spare parts, services, and training related to three of Paramount's helicopters. The third was for an account stated between AAC and Paramount for $62,788.98 for unpaid lease payments and goods, services, and training, plus 1.5% interest per month after September 1989. The contracts were governed by Pennsylvania law.

AAC proffered the relevant lease agreements and invoices, and an affidavit from its Vice President of Finance and Administration, Vincent Genovese, detailing the amounts

_____

preclude the present suit. However, we are inclined to think that the releases in FSQ, which specifically excluded the PAC claims, would operate as a waiver of a preclusion defense. See Publicis, 132 F.3d at 366; cf. Bristol Farmers Market & Auction Co. v. Arlen Realty & Devel. Corp., 589 F.2d 1214, 1220–21 (3d Cir. 1978) (parties are not precluded from arbitrating claims that would normally be precluded by the compulsory counterclaim rule if they have agreed to arbitrate those claims); Restatement (Second) of Judgments S 26(1)(a) (providing that parties may agree "in terms or in effect" that a plaintiff may split a claim).

22

not paid and calculating the interest due thereunder. For its account stated claim, AAC submitted a November 14, 1991, letter from Genovese to Al Bartone, Paramount's president. The letter states:

> This letter shall formalize our agreement in which you have agreed to make monthly payments of $3,000 commencing 1/1/1992 in order to satisfy the debts owed by Paramount to Agusta Aerospace. As of October 31, 1991, the outstanding balance was $88,829.02 which includes interest of $10,361.00. Interest will continue to accrue on the principal amount of the debt until it is paid in full.
>
>  Please indicate your agreement with these terms by signing below.

Bartone signed "Agreed" on November 14, 1991. Paramount states that, in addition to this letter, it entered into a "short-term lease agreement" with AAC on the same day. This agreement gave Paramount the right to lease a newer model 109 helicopter from AAC for an hourly rental fee, and Paramount agreed to attempt to sell this aircraft on commission. Paramount contends that this new lease agreement was part of a package deal that also included the agreement relating to past debts quoted above. However, Paramount does not challenge AAC's basic underlying evidence regarding the existence and terms of the 1987 helicopter lease and the service contract.

Paramount defended against the account stated claim by noting that, although the November 14 Genovese/Bartone letter was signed two days after AAC filed counterclaims, the amount in the letter differs from that in the counterclaim, and the letter makes no mention of those counterclaims. Paramount also argued that AAC did not submit proof that it demanded payment before filing the counterclaims. The District Court found Paramount's arguments persuasive to defeat the account stated claim, but ultimately irrelevant, because the relief sought on the account stated claim was exactly the same relief sought on the two breach of contract claims, on which it granted summary judgment to AAC. We agree.

In fact, Paramount did not effectively challenge AAC's entitlement to the amounts asserted in the counterclaims, except to offer a number of defenses: an argument that the November 14 letter constituted an accord and satisfaction or a novation; a claim that AAC had waived its counterclaims; and various equitable defenses. It also asserted a set-off. The District Court rejected these defenses. We take them up in turn, except for the equitable defenses, which we dispose of summarily in the margin.12

A. Accord and Satisfaction or Novation

Paramount contends that there was an accord and satisfaction or a novation, based on the November 14 letter. An accord and satisfaction is a substitute contract for settlement of a debt by some alternative other than full payment. See Occidental Chem. Corp. v. Environmental Liners, Inc., 859 F. Supp. 791 (E.D. Pa. 1994). The consideration is the resolution of a disputed claim. The District Court found that the November 14 letter might be evidence of an accord, but that there was no evidence that Paramount had made payment according to the agreement, which is required for satisfaction. See Beechwood Commons Condominium Ass'n v. Beechwood Commons Assocs., Ltd., 580 A.2d 1, 5 n.2 (Pa. Super. Ct. 1990). We agree. When an accord is breached, the non-defaulting party can enforce, at its option, the underlying agreement or the accord. See

_____

12. Paramount asserted a hodgepodge of equitable defenses, which the court held inapplicable to AAC's counterclaims. Estoppel, for example, requires material misrepresentation, reasonable reliance, and resulting damage. See Greenberg v. Tomlin, 816 F. Supp. 1039, 1055 (E.D. Pa. 1993). The District Court found no evidence of misrepresentation. As for unclean hands, that defense applies when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities. See Equibank v. Adle, Inc., 595 A.2d 1284, 1287 (Pa. Super. Ct. 1991). However, Paramount does not allege that the invoices that are the subject of the counterclaim deal with services that were negligently provided, nor would a vibration problem in one helicopter be enough to establish the defense. Furthermore, the court found no evidence of unconscionability or that the contract was against public policy. The equitable defenses are essentially conclusory and we think that the District Court was correct to reject them.

Nowicki Constr. Co. v. Panar Corp., 492 A.2d 36, 40 (Pa. Super. Ct. 1985). Thus, without any evidence of satisfaction (and there was none), there was not a scintilla of evidence supporting this defense. We find no error in the District Court's reasoning on this point.

Paramount then argued that the letter was a novation, extinguishing the former obligation by another new promise. In a novation, the new promise itself satisfies the preexisting claims, whereas in an accord it is the performance of the new promise that does so. See id. A novation bars revival of the preexisting duty. See Beechwood, 580 A.2d at 5. The essential difference between an accord and a novation is the parties' intent. See Nowicki, 492 A.2d at 40. The party asserting a novation has the burden of proof. See Buttonwood Farms, Inc. v. Carson, 478 A.2d 484, 486 (Pa. Super. Ct. 1984). The District Court found that there was no evidence of any kind that the parties intended to extinguish their obligations under the original lease and contract.

Paramount claims that a jury could find the letter to be a novation, especially when viewed in context with the lease agreement for the new model 109A helicopter executed the same day and given that the amount in the letter differed from that stated in the counterclaim. The existence of a substituted contract is generally for the jury. See Proie Bros., Inc. v. Proie, 301 F. Supp. 680, 682 (W.D. Pa. 1968), aff'd, 414 F.2d 1365 (3d Cir. 1969). However, we do not think that a reasonable jury could find that the November 14 lease agreement or the counterclaim evidence an intent to enter into a novation. There is simply no suggestion in the record that either of the parties considered the November 14 letter to be a new contract. On its face it is no more than an agreement to pay amounts owed on a certain schedule, and Paramount has offered no other evidence of the parties' intent.[13]

---

13. If there was a new contract, Paramount further argues, the statute of limitations has run on it, because the counterclaim was never amended to include the new contract. Because we conclude that there was no new contract, we need not resolve this issue.

B. Waiver

Paramount also argues that AAC waived its claim by failing to send dunning notices or to take any steps to collect the debts that were due and owing until Paramount sued. Under Pennsylvania law, waiver of legal rights can arise by clear, unequivocal, and decisive action by a party with knowledge of such rights and evident purpose to surrender them. Waiver can be express or implied from conduct in situations that would support equitable estoppel. The party claiming implied waiver must show that it was misled and prejudiced by the other party's conduct. See Prousi v. Cruisers Div. of KCS Int'l, Inc., 975 F. Supp. 768, 771–72 (E.D. Pa. 1997). Under these requirements, the court held, Paramount could not prove waiver. Even assuming that AAC made no attempt to collect on its debts until sued, Paramount was neither misled nor prejudiced. Moreover, failure to demand payment is simply not a clear, unequivocal, and decisive action. As long as the claim was asserted within the statute of limitations, as it was, Paramount had no reasonable expectation that it would be free from the counterclaim.

C. Disputes as to Amount

Paramount also makes several claims about the amount due. First, it argues that the award of 1.5% interest on the goods and services contract was inappropriate, because only the helicopter lease agreement provided for interest, and because many of the invoices for goods and services were issued after September 1989, while interest was calculated on the entire amount in controversy starting from September 1989. See App. at 640. However, as the District Court observed, Paramount never attempted to rebut AAC's calculation, expressed in the affidavit of its Vice President, Mr. Genovese. We will not allow it to do so on appeal.

Second, Paramount contends that AAC sought compensation for goods and services with respect to a helicopter numbered 7341, which Paramount never owned or operated. However, Paramount never submitted evidence to the District Court to counter AAC's affidavit. Although Paramount denied knowledge or information about the

26

helicopter in its responses to requests for admission, its general denial is insufficient to create a genuine issue of fact. See United States v. Bottenfield, 442 F.2d 1007, 1008 (3d Cir. 1971).

Paramount finally argues that there was a difference between the amount claimed in the counterclaim ($62,788.98 without interest) and the amount stated in the November 14 letter ($78,468.02 without interest), despite the fact that the counterclaim was filed two days before the letter was sent, and that this creates a genuine issue of material fact. We disagree, concluding that the District Court was correct to award judgment on the breach of contract claim based on the Vice President's affidavit about the amounts Paramount owed. This is true regardless of what the November 14 letter said, because if it was an accord it was never satisfied and thus Paramount was responsible for the initial obligation.

D. The Setoff

Paramount asserted a setoff based on the same facts that grounded its initial claim, i.e., Paramount alleged that the 1989 crash was caused by Agusta's defective manufacturing and maintenance, and that the crash caused Paramount significant harm. Paramount argued that the helicopter that was the subject of the counterclaim also had a vibration problem like the problem that caused the crash, although the District Court found the maintenance records difficult to decipher on that point. Thus, Paramount contends that it is entitled to recover from the Agusta defendants for the harm caused by the crash-related events, which offsets any amount it might owe AAC. The District Court rejected the setoff claim on entire controversy grounds. Because we have found the entire controversy doctrine inapplicable to Paramount's claims, Paramount will be entitled to try to prove its case on remand and, if it prevails, it may offset any recovery against the amount owed on the counterclaims. In sum, we uphold the District Court's determination of the amount due on the counterclaims. However, because the setoff may be a valid claim, we will vacate the judgment on the counterclaims pending resolution of Paramount's claims on remand.

IV. Conclusion

For the foregoing reasons, we will reverse the District Court's grant of summary judgment to the Agusta defendants on Paramount's tort claims and remand for further proceedings. We will affirm the District Court's determination of the amount owed on AAC's counterclaims, but vacate the judgment on the counterclaims pending disposition of Paramount's tort claims.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit